785 F.2d 897
 54 USLW 2582, 229 U.S.P.Q. 321, 1986
Copr.L.Dec. P 25,918
 DONALD FREDERICK EVANS AND ASSOCIATES, INC., d/b/a The Evans
Group, etc., Plaintiff-Appellant, Cross-Appellee,
v.
CONTINENTAL HOMES, INC., a Florida corporation, Complete
Interiors, Inc., a Florida corporation, and David
Mann Meadows, Defendants-Appellees,
Cross- Appellants.
DONALD FREDERICK EVANS AND ASSOCIATES, INC.,
Plaintiff-Appellant, Cross- Appellee,
v.
David Mann MEADOWS, an individual, Complete Interiors, Inc.,
d/b/a Continental Homes, Defendants-Appellees,
Cross-Appellants.
 No. 84-3723.
 United States Court of Appeals,
Eleventh Circuit.
 March 31, 1986.
 
 Herbert L. Allen, Orlando, Fla., for plaintiff-appellant, cross-appellee.
 Ladd H. Fassett, Orlando, Fla., for defendants-appellees, cross-appellants.
 Appeals from the United States District Court for the Middle District of Florida.
 Before GODBOLD, Chief Judge, KRAVITCH, Circuit Judge, and SIMPSON, Senior Judge.
 KRAVITCH, Circuit Judge:
 
 
 1
 The Evans Group[1] (Evans), a Florida architecture and planning firm, appeals from judgments in two civil actions, 81-706-CIV-ORL-18 and 83-276-CIV-ORL-18, rendered in favor of the defendants below, Complete Interiors, Inc.[2] (CI), a Florida land development and contracting company, and its general manager David M. Meadows (Meadows). In both actions, Evans appeals the district court's judgment for CI and Meadows as to its claims of copyright infringement under the Copyright Act of 1976,[3] 17 U.S.C. Sec. 501. Evans also seeks reinstatement of its various other claims in case 81-706: it challenges the district court's finding that 17 U.S.C. Sec. 506(c) does not authorize a private cause of action and dismissal of its claim thereunder; it seeks relief from a directed verdict entered on its common law claim and its Florida statutory claim of unfair competition; and it appeals from judgment for CI and Meadows as to its claim of libel of title. CI and Meadows assert on cross-appeal that the district court's denial of their claims for attorney's fees should be reversed. They also advance several alternative grounds on which the trial court could have relied to find that Evans' claims did not merit relief.
 
 
 2
 The district court properly exercised jurisdiction over the federal copyright statute claims in both cases pursuant to 28 U.S.C. Sec. 1338(a) and determined that exercising pendent jurisdiction over the state law claims in case 81-706 was proper under 28 U.S.C. Sec. 1338(b) and United Mine Workers v. Gibbs, 383 U.S. 715, 725-26, 86 S.Ct. 1130, 1138-39, 16 L.Ed.2d 218 (1966). The cases were consolidated for trial. After the directed verdict on the unfair competition claims, the jury was dismissed by agreement of the parties. We have jurisdiction over both the federal statutory and the pendent state claims under 28 U.S.C. Sec. 1291 and Hudak v. Economic Research Analysts, Inc., 499 F.2d 996, 1001 (5th Cir.1974), cert. denied, 419 U.S. 1122, 95 S.Ct. 805, 42 L.Ed.2d 821 (1975).[4]
 
 I. BACKGROUND
 
 3
 The district court's findings of fact indicate the following. Three clients hired Evans to create architectural design drawings (working drawings) of new single-family home designs to be built in their residential developments. In February, 1979, Evans completed working drawings of the Baywood design for Betsy Godfrey's Waterbridge development. In December, 1979, pursuant to a letter agreement, Evans completed working drawings of the Rivendell design for H. Miller & Sons' Tuskawilla Point development. In January, 1982, pursuant to a written contract, Evans completed working drawings of five designs including the Hollybrooke, Sunridge,[5] and Woodlyn[6] designs, for Olin-American's Moss Pointe development. Evans affixed a notice of copyright to the 1982 working drawings of the plans created for Olin-American, but had not affixed any notice to those created for Godfrey or H. Miller & Sons. Drawings of the plans were published on various occasions.
 
 
 4
 Drawings of the floor plans and of the facades of these home designs, except for the Hollybrooke, appeared in one or more issues of the Parade of Homes supplement to Orlando, Florida's daily newspaper, the Sentinel Star, now named the Sentinel. The Parade of Homes, captioned "Advertising Supplement" on its front page, is an annual publication in which local builders and developers display new home designs. No notice of copyright was affixed to any of the drawings of Evans' home designs included in the Parade of Homes supplements, nor did the title pages of the supplements or any of the introductory portions contain a mention of copyright. The front page of the Sentinel newspaper, however, contained a copyright notice underneath its masthead. The chart below summarizes the district court's findings concerning the appearances of the plans in the Parade of Homes supplements:
 
 
 5
 Approximate Number of Copies Distributed
 ------------------------------------------
 Issue Model with newspaper without newspaper
----------- -------------- -------------------- --------------------
1979 Parade Starshine 220,994 8,000
 (aka Sunridge)
1980 Parade Baywood 224,133 8,000
 Rivendell 224,133 8,000
 Starshine 224,133 8,000
 (aka Sunridge)
1982 Parade Woodlyn 236,611 10,000
1984 Parade Mulberry 200,000
 (aka Woodlyn)
 
 
 6
 In addition to the appearances in the Parade of Homes, the district court found that various other publications contained drawings of the five plans as follows:
 
 
 7
 The Baywood was published in a promotional flyer bearing no notice of copyright, of which 100 copies were distributed.[7]
 
 
 8
 The Rivendell was published in a sales brochure bearing no notice of copyright, of which 5,000 copies were distributed.
 
 
 9
 The Sunridge (a/k/a Starshine) was published in a brochure promoting the Moss Pointe development bearing no notice of copyright, of which approximately 1,000 copies were distributed; and in a Moss Pointe advertising folder obtained in April, 1982, bearing no notice of copyright, of which approximately 1,500 copies were distributed.
 
 
 10
 The Woodlyn (a/k/a Mulberry) was published in the same Moss Pointe brochure and advertising folder of which approximately 1,000 and 1,500 copies were distributed respectively; and in a full-page advertisement which appeared, without an individual copyright notice, in the May 1, 1982, edition of the Sentinel of which approximately 198,000 copies were distributed; and as the Mulberry in a promotional brochure for the Country Lane development bearing no notice of copyright, of which approximately 1,500 copies were distributed.
 
 
 11
 The Hollybrooke was published in the same Moss Pointe brochure and advertising folder of which approximately 1,000 and 1,500 copies were distributed respectively; and in a lay-out comprised of a photograph and a drawing which appeared, without an individual copyright notice, in the December, 1982 issue of Professional Builder magazine of which approximately 100,000 copies were published.
 
 
 12
 Sometime after the distribution of the 1980 Parade of Homes, defendant Meadows, using the drawings therein, copied the Baywood and Rivendell plans, and renamed them the Morning Glory 1F and the Autumn IIIE, respectively. CI and Meadows constructed homes from the plans, began advertising, and established a sales office to promote them. They did not construct model homes; their employees, however, directed prospective customers to view the model homes built by Evans' clients, Godfrey and H. Miller & Sons, explaining that those models were very similar to defendants' homes, although defendants' would be considerably less expensive.
 
 
 13
 Evans learned of the advertising of the Morning Glory 1F in the fall of 1980 and contacted its attorney who then sent an investigator to ascertain what CI's customers were being told. Evans' attorney requested by letter in November, 1980 that CI stop directing its customers to the models built by Evans' clients, but indicated in the letter that no copyright issue was involved. CI's employees ceased referring customers to the models, but continued to advertise the homes.
 
 
 14
 After seeing the Woodlyn plans in the 1982 Parade of Homes, defendant Meadows visited the Moss Pointe models in June of 1982 and again in November of 1982. Using a brochure obtained during his second visit, Meadows prepared plans substantially similar to the Sunridge, Woodlyn, and Hollybrooke. The models were renamed the Riverwood, Highlander, and Morningstar respectively. CI began advertising its homes in December, 1982.
 
 
 15
 Evans obtained copyright registration number VA93-273 for the Baywood working drawings, and copyright registration number VA93-272 for the Rivendell working drawings, effective dates August 18, 1981. Evans obtained copyright registration number VA98-759, effective date May 5, 1982, for the working drawings of the Moss Pointe development homes which include the Sunridge, Woodlyn, and Hollybrooke. In the latter part of 1982, Evans requested its client, Olin-American to affix a copyright notice to the remaining Moss Pointe advertising folders; it was not until March 16, 1983, however, that Evans provided a rubber stamp for this purpose. Olin-American disapproved the stamp and returned it to Evans. On April 11, 1983, Evans obtained a new stamp, but by that time Olin-American had completed marketing the Moss Pointe homes.
 
 
 16
 Evans filed the complaint in case 81-706 in December, 1981, alleging, inter alia, infringement of its Baywood and Rivendell copyrights; in April, 1983, it commenced case 83-276 alleging infringement of its copyright covering the Sunridge, Woodlyn, and Hollybrooke. In both cases, Evans sought injunctive relief, an accounting for CI's and Meadows' profits or statutory damages, destruction of all copies held by them of Evans' copyrighted works, compensatory and punitive damages, and attorney's fees and costs. The cases were consolidated in March, 1984. A four-day trial followed. The jury was dismissed during the defendants' case-in-chief by agreement of the parties after the court had granted the defendants a directed verdict on the unfair competition claims. The remainder of the case proceeded as a bench trial. The district court issued its final judgment in August, 1984, denying relief on all of Evans' claims.
 
 II. FEDERAL COPYRIGHT CLAIMS
 A. Infringement
 
 17
 Evans' central claims, brought pursuant to 17 U.S.C. Sec. 501, allege that CI and Meadows infringed its copyrights in the five new home designs. The district court found that Evans had established a prima facie case of copyright infringement. The court held, however, that CI and Meadows were not liable because Evans had forfeited the protection afforded by the copyright statute through the publication, without copyright notice affixed, of a large number of copies of the works. We affirm the district court's holding, although we do not adopt the entirety of its analysis.
 
 
 18
 1. Prima Facie Case of Copyright Infringement: Ownership, Validity, and Copying
 
 
 19
 The plaintiff in a section 501 action establishes a prima facie case of copyright infringement by proving by a preponderance of the evidence (1) that it owns a valid copyright in the work allegedly infringed, and (2) that the defendant copied that work. Original Appalachian Artworks, Inc. v. Toy Loft, Inc., 684 F.2d 821, 824 (11th Cir.1982). Although copyright protection attaches at the time of an author's creation of an original work susceptible to copyright under 17 U.S.C. Sec. 102(a),[8] an owner's cause of action for infringement of that copyright is unenforceable until compliance with the formalities of registration, including payment of fees and deposit of copies of the work, is shown. 17 U.S.C. Sec. 411.[9] Ownership is also demonstrated through such compliance. In cases like Evans' where registrations were filed within five years after first publication of the works, the certificates of registration for the works "constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate," 17 U.S.C. Sec. 410(c), including the requirements of originality and susceptibility to copyright under 17 U.S.C. Sec. 102(a). See 3 Nimmer on Copyright Sec. 13.01[A], at 13-4. The burden then shifts to the defendants to rebut this presumption of validity. See id. at 13-5.
 
 
 20
 CI and Meadows challenge the validity of one of the copyrights, arguing that Evans' copyright as to the Sunridge is invalid because those drawings are substantially similar to those of the Starshine which were owned by Evans' previous client Wisconsin Real Estate Investment Trust and therefore they lack the requisite originality. The district court agreed that they are substantially similar but rejected the argument, finding that the defendants' offer of proof at trial, which consisted of a seven-year old contract between Evans and Wisconsin Trust, was insufficient to prove Evans did not own the Starshine plans. Although the language of the contract indicated that Wisconsin Trust originally owned the drawings and Evans was to be the custodian, the court refused to limit itself to the four corners of the contract in resolving the question of ownership. The court found that Evans' testimony that the contract was merely intended to prohibit his company from using the design in competition with its client, was not inconsistent with the contract. The defendants did not present any witnesses to refute this testimony. Furthermore, the defendants did not present any evidence as to the ownership of the copyright in the Starshine. They certainly did not establish that the author of the work, Evans, did not retain ownership of the copyright in the work regardless of who owned the actual drawings.[10] The district court correctly held that although Evans failed to list the Starshine as a pre-existing work on the Sunridge copyright registration application, this omission does not invalidate the registration because the defendants did not offer any evidence to prove that Evans' omission was intentional or purposeful. Without proof of the scienter element, the claim fails. Original Appalachian Artworks, 684 F.2d at 828. We, therefore, adopt the district court's finding of a valid copyright as to the Sunridge, as well as the other four designs, as not clearly erroneous.
 
 
 21
 The other element of a plaintiff's prima facie case, i.e. copying by the defendant, can be proved by direct or circumstantial evidence. Generally only circumstantial evidence is available; consequently courts have required that a plaintiff show that a defendant's work is substantially similar to the plaintiff's and that the defendant had access to the plaintiff's work. Ferguson v. National Broadcasting Co., 584 F.2d 111, 113 (5th Cir.1978). The court below found that CI's and Meadows' five architectural plans were substantially similar to those of Evans.[11] This finding concerning the similarity of the works is a finding of fact subject to the clearly erroneous standard. Original Appalachian Artworks, 684 F.2d at 825 n. 4. Our review of the record and exhibits supports the finding which we therefore adopt as not clearly erroneous.
 
 
 22
 A finding of access to the original copyrighted working drawings was not made. Instead, the district court relied on direct evidence of copying presented by Meadows' admission that CI's plans were copies from the drawings in the Parade of Homes and the promotional brochures. The defendants reiterate this admission in their brief to this court. They challenge, however, the finding that this constituted copyright infringement. The defendants argue that because they did not have access to the technical working drawings, which are the documents described in the copyright registration, they did not copy the protected works. The former Fifth Circuit rejected this argument in a case that is binding precedent in the Eleventh Circuit. In Imperial Homes Corp. v. Lamont, 458 F.2d 895, 899 (5th Cir.1972), the court acknowledged that construction of a substantially identical residential dwelling is not prohibited by the existence of a copyright in the architectural drawings for the original dwelling,[12] but the court held that if the builders of the substantially identical structure copied the floor plan set forth in a promotional booklet distributed by the builder of the original, then this copying would constitute infringement of the original builder's copyright privileges. Although the Imperial Homes booklet bore a notice of copyright, the absence of notice on the materials in the instant case does not invalidate the finding of copying, but rather goes to the question of forfeiture discussed below.[13] Because the defendants did not produce any evidence of independent creation or common source to refute the district court's finding of copying, see Miller v. Universal City Studios, 650 F.2d 1365, 1375 (5th Cir.1981), we affirm the district court's finding.
 
 2. Forfeiture of Statutory Protection
 
 23
 Under the federal statutory scheme, several defenses are available to an alleged infringer of copyrighted works to avoid liability to a copyright owner even though the elements of a prima facie case of infringement are established. See generally 3 Nimmer on Copyright Secs. 13.04-13.09. One such method is for the defendant to demonstrate that the copyright owner abandoned or forfeited the statute's protection. The district court in the instant case found that Evans forfeited the statutory protections as to all five designs. Evans challenges the finding on numerous grounds discussed below. Although we hold that the record does support a finding of forfeiture, we view some of the underlying facts differently than did the district court.
 
 
 24
 The legislative history of the Copyright Act of 1976 emphasizes the benefits of requiring copyright owners to display a notice of copyright on their published works. See H.R.Rep. No. 1476, 94th Cong., 2d Sess. 143, reprinted in 1976 U.S.Code Cong. & Ad.News 5659, 5759 [hereinafter cited as House Report].[14] It also explains that under the first federal copyright statute of 1790, and under the statutes enacted from 1802 through 1909, a copyrighted work published without the prescribed notice of copyright displayed was not protected. Id. Upon such publication, a work entered the public domain. Under the 1976 Act, which superseded the 1909 Act, the consequences of omitting notice of copyright are not as harsh. The House Report indicates that Congress was concerned about the unfairness of the automatic denial of copyright protection due to inadequate notice in cases where the omission of notice was unintentional or the error in form of the notice was minor. Id. Congress struck a balance by drafting a statute that would induce copyright owners to use a notice but "without causing outright forfeiture for errors or omissions." Id. The result was section 405. Under section 405(a) copyright protection is not forfeited by authorized publication of a work without notice if:
 
 
 25
 (1) the notice has been omitted from no more than a relatively small number of copies or phonorecords distributed to the public; or
 
 
 26
 (2) registration for the work has been made before or is made within five years after the publication without notice, and a reasonable effort is made to add notice to all copies or phonorecords that are distributed to the public in the United States after the omission has been discovered; or
 
 
 27
 (3) the notice has been omitted in violation of an express requirement in writing that, as a condition of the copyright owner's authorization of the public distribution of copies or phonorecords, they bear the prescribed notice.
 
 
 28
 17 U.S.C. Sec. 405(a). Owners are still induced to use a notice because oftentimes the savings provisions of section 405(a) may not apply. Also, under section 405(b), a copyright owner is precluded from recovering certain damages or obtaining some types of relief in a cause of action against an "innocent infringer," i.e. one who relies on a copy from which notice was omitted and ceases the infringing actions upon receiving notice of the copyright registration.
 
 
 29
 The district court found that more than a relatively small number of copies of Evans' designs from which notice had been omitted were distributed to the public. It further found that although registrations of the works were made within the five-year period, Evans failed to make a reasonable effort to add notice to the copies distributed after it discovered the omissions. Finally, the court found that there had been no express written requirement conditioning authorization for publication on use of the notice.
 
 
 30
 a. Omission of Notice on More than a Relatively Few Authorized Copies
 
 
 31
 Evans contends that the district court's calculations of how many copies of the designs were distributed without notice affixed are overinclusive because some of these copies did carry an adequate copyright notice and some of the publicly distributed copies were not authorized. Evans argues that those authorized appearances which did occur without notice were relatively few in number and therefore section 405(a)(1) ensures Evans' continued statutory protection in these copyrights and entitles it to relief.
 
 
 32
 First, we address Evans' contention that the drawings of the Baywood, the Rivendell, the Starshine/Sunridge, and the Woodlyn/Mulberry in the Parade of Homes supplements were contributions to a collective work--the Sentinel--and therefore, under 17 U.S.C. Sec. 404, the Sentinel's copyright notice on the front page of the newspaper was sufficient to satisfy the notice requirements as to Evans' drawings in the supplements. We reject this argument. The record reveals that a relatively large number of copies of the Parade of Homes supplements were distributed separately from the newspapers; consequently nothing bearing a notice of copyright accompanied those supplements. These distributions of the Parade of Homes did not inform the public of the existence of any copyright in the publication or its contents. Rather than preventing innocent persons from unknowingly using the material and being subject to a finding of infringement, the distributions would have led a reader to believe that the works were in the public domain.
 
 
 33
 We also find that even the copies of the supplements that were accompanied by the Sentinel were not protected by the newspaper's collective copyright because they were advertisements submitted by someone other than the copyright owner and thus come under the advertisement exception to the collective copyright provision. According to 17 U.S.C. Sec. 404,[15] a single notice of copyright for a collective work can in some instances fulfill the notice requirements as to the individual works collected therein, regardless of who owns the copyrights of the individual works.[16] The statute, however, specifically excludes from such protection "advertisements inserted on behalf of persons other than the owner of copyright in the collective work." 17 U.S.C. Sec. 404(a). Congress explained that this exclusion was justified by the special circumstances resulting from the common practice of publishing the same advertisement in several different collective works. House Report, supra, at 146, reprinted in 1976 U.S.Code Cong. & Ad.News at 5762. Congress intended that separate copyright notices be required for most advertisements included in collective works and stated that the requirement would not impose an undue burden on copyright owners. Id.; see also Southern Bell Telephone & Telegraph Co. v. Associated Telephone Directory Publishers, 756 F.2d 801, 811 (11th Cir.1985). Whether the Sentinel's notice of copyright served as a notice for the drawings of Evans' designs contained in the accompanying supplement therefore depends on whether the drawings were advertisements.[17]
 
 
 34
 The Copyright Act does not define what constitutes an advertisement under the Act. Nor does the legislative history provide guidance. The Supreme Court has addressed the question in limited contexts, stopping short of analyzing what characteristics are determinative of whether a work constitutes an advertisement. Evans argues that the drawings in the Parade of Homes supplements were not advertisements because they were contest materials, not solely advertising, and also possessed qualities not found in conventional advertising. Evans quotes language from the district court opinion acknowledging that the drawings in the Parade of Homes may have an "aesthetic or artistic component." The Supreme Court recognized long ago that advertisements often have artistic worth. In Bleistein v. Donaldson Lithographing Co., 188 U.S. 239, 23 S.Ct. 298, 300, 47 L.Ed. 460 (1903), the Court noted that "works are not the less connected with the fine arts because their pictorial quality attracts the crowd, and therefore gives them a real use,--if use means to increase trade and to help to make money." Evans' efforts to remove the drawings from the advertisement characterization because they have a worth beyond advertising necessarily fails. The district court correctly found that notwithstanding their artistic value the drawings in the Parade of Homes were advertisements. A finding to the contrary would fly in the face of the clear message sent to the readers by the label "Advertising Supplement" contained on the front page of the Parade of Homes supplements. In addition, although the supplement is packaged as a competition among homebuilders, a substantial entrance fee was paid and the clear purpose of the publication was to entice readers to buy one of the homes depicted therein. Our review of the record also revealed that each annual Parade of Homes supplement contained either maps to guide prospective buyers to the homes or written directions of how to locate the sites. None of the supplements contained any news articles or features.
 
 
 35
 Next, Evans asserts that the appearance of the Hollybrooke photograph and drawing in the Professional Builder was protected by that magazine's collective copyright under section 404. The district court did not apply the same analysis to this claim of collective copyright as it did to the Parade of Homes claims. It did not find specifically that the Hollybrooke appearance constituted an advertisement, but it, nevertheless gave no effect to the Professional Builder's copyright. It stated, without supporting analysis, that "the Hollybrooke floor plans appeared without a notice of copyright 102,500 times," apparently adding the 100,000 copies of the issue of Professional Builder, the 1,000 copies of the Moss Pointe brochure, and the 1,500 copies of the advertising folder, to total 102,500. We infer from the structure of the district court's opinion that either (1) it found that the Hollybrooke's appearance was an advertisement for the same reasons as the Parade of Homes appearances, or (2) it reasoned that because the owner of the copyright of Professional Builder was not Evans, the Professional Builder copyright notice was inadequate notice for Evans' design. We find that both analyses fail and that it was clearly erroneous for the district court to count these copies as copies having appeared without notice. We already have discussed why the second rationale is legally incorrect. See supra note 16. Our review of the record indicates that a finding based on the first analysis would be clearly erroneous because the appearance of the Hollybrooke in the Professional Builder does not bear the characteristics which places the Parade of Homes appearances in the category of advertisement. Whereas the Parade of Homes supplements are prominently labeled "Advertising Supplement" on their front pages, the Professional Builder is identified on its title page as a "Business Magazine of Housing and Light Construction" and contains feature articles and columns as well as advertisements. The Hollybrooke lay-out is included in a report identifying awards given to new home designs with the aim of encouraging "the construction of smaller/smarter new housing that is affordable for more Americans." Neither the building nor the designer of the Hollybrooke or of the other award winners are listed in the advertiser's index at the back of the magazine. Entrants in the Professional Builder competition did not pay a fee and no directions to the specific sites of the homes were given. We find that this appearance of the Hollybrooke was not an advertisement but rather was part of a feature article that constituted a separate contribution to the magazine and therefore was protected by the copyright notice appearing on the masthead page of that issue of the Professional Builder.
 
 
 36
 Evans also claims that the publications by Olin-American of its designs in promotional brochures, advertisements, and the Parade of Homes are not properly included in the calculation of the number of copies published without notice because they were not authorized by Evans. Evans is correct in asserting that a finding of forfeiture of copyright protection cannot be based on unauthorized distribution of the work without notice because the notice requirement applies only to copies of works published "by authority of the copyright owner." 17 U.S.C. Sec. 401(a). Although the district court did not directly address the question of authorization as to each of the distributions of the copies of the designs, the record supports a finding that they were authorized. The record indicates that Evans was aware of the publications by Olin-American and had been aware at the time it created the designs that they would be published, thereby constituting implicit authorization when Evans acquiesced to the publications rather than objecting to them. Evans points to its contract[18] with Olin-American as evidence that Olin-American's publication of the designs was unauthorized. According to the written terms of the contract, Olin-American was to obtain Evans' written permission before copying any of the project documents. The record reveals, however, that during his appearance as a rebuttal witness, the president of the appellant Evans Group testified on cross-examination that he knew of the publications in the Parade of Homes and the brochures and never enforced the contract provision requiring written authorization. Only once did Evans even make any effort to have a copyright notice added to the Olin-American brochures; it apparently never sought to have the publications halted. Evans cannot now invoke a contract provision, the enforceability of which it waived vis-a-vis its own client, in order to undermine the defendants' assertion that Evans forfeited its copyright. Moreover, the savings provision of section 405(a)(3) clearly explains that in order for a copyright owner to protect its copyright registration it can include an "express requirement in writing that, as a condition of the copyright owner's authorization of the public distribution of copies ... they bear the prescribed notice." We have recognized that the "logical inference from this requirement is that an implied condition, or even an express condition if not in writing, will not preserve a copyright against the effects of publication without notice or publication with inadequate notice." Fantastic Fakes, Inc. v. Pickwick International, Inc., 661 F.2d 479, 484 n. 3 (5th Cir. Unit B 1981);[19] see also 2 Nimmer on Copyright Sec. 7.03, at 7-11--7-12. Evans did not include such a condition in its contract with Olin-American.
 
 
 37
 Finally, Evans makes the broad assertion that the district court erred in its calculations that led to the determination that forfeiture occurred because it imputed to Evans various unauthorized promotional uses made by its clients. As to the Hollybrooke, Sunridge, and Woodlyn created for Olin-American, we have explained our reasons for rejecting the assertion that the client's promotional uses were unauthorized. As to the Baywood created for Godfrey and the Rivendell created for H. Miller & Sons, we find the allegation of unauthorized promotional use even weaker. During his appearance as an adverse witness, the president of the Evans Group testified on direct examination that he knew at the time of the publication of the 1980 Parade of Homes advertising supplement that the Rivendell and Baywood were to appear in it. He testified that he gave express verbal authorization for the Rivendell. He also testified that he knew of the promotional brochures for both plans. In fact, he attended the opening of the Rivendell model, saw the distribution of brochures, and did not object to such uses. The record further indicates that Evans had no written contract with Godfrey, and had a simple letter agreement with H. Miller & Sons which did not preclude promotional uses of the drawings or place conditions on them. In light of the record as a whole, we reject Evans' argument that these promotional uses by Godfrey and H. Miller & Sons were unauthorized.
 
 
 38
 The preceding analysis establishes that except for the 100,000 copies of the Hollybrooke design distributed in the Professional Builder, all of the copies of the works listed by the district court in its findings and summarized above were properly considered in determining that Evans forfeited the copyright protections in its works. It is evident then that the savings provision of section 405(a)(1), whereby omission of notice does not result in forfeiture if there is no more than a relatively small number of copies without notice distributed, cannot apply to the Baywood, Rivendell, Sunridge, or Woodlyn since 100% of the publicly distributed copies lacked notice. In situations where notice is omitted from less than 100% of the published copies, as in the case of the Hollybrooke, it is more difficult to determine whether section 405(a)(1) applies. Courts and commentators disagree as to what constitutes "no more than a relatively small number of copies." Professor Nimmer points out that the Register of Copyright interpreted the phrase " 'to establish that the number must be small in an absolute sense and not merely in relation to the size of the entire edition. For example, this requirement would not be satisfied if the notice were omitted from 1,000 copies out of an edition of 100,000.' " 2 Nimmer on Copyright Sec. 7.13[A], at 7-88 (quoting the Register's Supplementary Report at 106). Nimmer then asserts that this interpretation should not be adopted, though, because the House Report did not include it. Instead, the House Report simply explained that the phrase is "less restrictive" than the provision in the 1909 Act that excused accidental omission of notice if only "a particular copy or copies" were published. Id. Nimmer also contends that the use of the term "relatively" in the phrase logically means "relative to the total number of copies distributed to the public" rather than an absolute number. Id. Finally, Nimmer asserts that the holding in Original Appalachian Artworks v. Toy Loft, Inc., 684 F.2d 821 (11th Cir.1982), contradicts the Register's interpretation. Id. We agree that the question of what constitutes "no more than a relatively small number of copies" cannot be answered merely by reference to an absolute number. We disagree, however, with the assertion that the holding in Original Appalachian Artworks to the effect that 1 percent (400) of the total number of copies meets the "relatively few" test, necessarily contradicts a conclusion that 1,000 copies amounting to 1 percent of the total number in another situation would not meet the test. The question must be answered on a case-by-case basis in light of the totality of the circumstances. We find that on the facts of this case, the 2,500 copies of the Hollybrooke in the promotional brochure and advertising folders, which totaled approximately 2.4 percent of the total number of copies, constitutes more than a relatively small number. Unlike the situation in Original Appalachian Artworks where the 1 percent had defective notices,[20] the copies we are considering in the instant case had absolutely no indication of copyright affixed. Furthermore, 2,500 copies is a significant number in the absolute sense. Hence, we find that the savings provision of section 405(a)(1) does not apply to the Hollybrooke either.
 
 
 39
 b. Failure to Make a Reasonable Effort to Cure the Omissions
 
 
 40
 Even if more than a relatively small number of copies are publicly distributed without copyright notice, a copyright owner can nevertheless cure the omission if the copyright in the work is registered within five years after such publication, and if the owner makes "a reasonable effort ... to add notice to all copies ... that are distributed to the public in the United States after the omission has been discovered." 17 U.S.C. Sec. 405(a)(2). Evans' registrations of the copyrights for its five works within the five-year period is undisputed and clearly supported by the record. Evans argues that it cured the omissions as to the Sunridge, Hollybrooke, and Woodlyn because after discovering the omission it attempted to have Olin-American affix a notice to the as-yet undistributed brochures by means of a rubber stamp provided by Evans. We reject this argument as did the district court but for different reasons.[21]
 
 
 41
 The district court reasoned that because Evans only attempted to have OlinAmerican add notice to copies distributed after discovery of the omission and not to those previously disseminated, section 405(a)(2) did not apply. We find that Evans' effort to ensure that Olin-American add a notice to the copies distributed after discovery of the omission was such an inadequate effort that no further consideration of whether the effort should have extended to any already distributed is necessary.[22] Evans' actions definitely did not reach the "reasonable effort" standard of section 405(a)(2). The record reveals that the president of the Evans Group knew in May, 1982, that Olin-American was distributing brochures containing Evans' designs without a copyright notice. He testified that he informed the president of Olin-American of the omission at that time, but took no further action because notifying the client was all one could do at that point. It was not until March, 1983, that Evans obtained a rubber stamp of its copyright notice and sent it to Olin-American. When Olin-American returned the stamp out of dissatisfaction with the size, Evans failed to provide another stamp until a month or so later. These efforts are completely inadequate especially in light of the simple and inexpensive method by which the notice could have been added to the brochures immediately upon discovery.
 
 
 42
 We also find that section 405(a)(2) does not save the Baywood or the Rivendell from forfeiture but for reasons other than those relied upon by the district court. Again, we refrain from determining whether Evans' failure to add notice to previously disseminated copies necessarily means it did not make a reasonable effort. Rather, we find that at the time Evans sent CI its November, 1980 letter concerning its referral of customers to the model homes built by Godfrey and H. Miller & Sons, it had notice of potential copyright problems and knew or should have known, of the omission of notice on the copies being distributed in the flyers and sales brochures since it stated in the letter that no copyright issue was involved in the dispute. Evans did not make an adequate showing that it made a reasonable effort to add a proper notice to all copies thereafter. Evans only showed that at some point after the first printing of 5,000 copies, H. Miller & Sons reprinted its sales brochure and added a notice that had no effect because it failed to comport with the prescribed notice. See 17 U.S.C. Sec. 406(c). We also note that in spite of its knowledge of the appearances in the Parade of Homes advertising supplement, Evans did not ensure that a proper notice was affixed to those drawings.
 
 
 43
 c. Intent of Publisher
 
 
 44
 Evans asserts that because both the Sentinel and the Parade of Homes contest sponsor, the Home Builders Association, intended for the drawings to be protected by the Sentinel's notice, the court's finding that such notice did not cover the drawings was incorrect. We reject this argument. The statutory scheme clearly foresees copyright protection being forfeited for some works against the intent of the copyright owner, although the savings provisions of section 405 are aimed at providing the owner with an opportunity to avoid this result. The fact that the parties did not intend to lose copyright protection is relevant to the question of whether there was an abandonment of copyright but not to the issue of forfeiture. Professor Nimmer explains that "[d]espite imprecise usage in some of the cases, abandonment must be distinguished from forfeiture of copyright. The latter may occur as a consequence of publication without proper copyright notice and is effectuated by operation of law regardless of the intent of the copyright owner." 3 Nimmer on Copyright Sec. 13.06, at 13-130 (footnotes omitted). Although the statutory language does not define either term, the common law made this distinction, National Comics Publications, Inc. v. Fawcett Publications, Inc., 191 F.2d 594, 597-98 (2d Cir.1951), clarified, 198 F.2d 927 (2d Cir.1952), and the legislative history of the 1976 Act does not indicate that Congress intended to depart from the common law usage. This court has continued to distinguish between abandonment and forfeiture. Fantastic Fakes, Inc., 661 F.2d at 486 n. 6. Evans' argument based on intent of the persons involved therefore is irrelevant to the forfeiture issue. Accordingly we affirm the holding that Evans forfeited the copyright protection in the five designs so that the works were dedicated to the public domain. Judgment for CI and Meadows in case 83-376 is affirmed, and judgment for CI and Meadows on the infringement claims in case 81-706 is affirmed.
 
 B. Fraudulent Copyright Notice
 
 45
 Evans' remaining federal claim in case 81-706 was brought under 17 U.S.C. Sec. 506(c). Section 506 lists four criminal offenses actionable under the Copyright Act. Subsection (c) authorizes imposition of a fine for fraudulent copyright notice.[23] Evans argues that he has standing to seek an injunction under this provision against CI and Meadows' publication of their copies of the Baywood and Rivendell with a copyright notice affixed which indicates that they are the owners of the copyright. The district court's final judgment held that section 506 is a criminal statute and hence does not permit a private cause of action. The record indicates, however, that this claim was not properly before the district court at the time of the final judgment, having been dismissed by order of another district judge to whom the case previously had been assigned. In the prior order dated December 15, 1982, the court found that no private right of action could be maintained under section 506, citing Cort v. Ash, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). We affirm this holding.
 
 
 46
 Apparently, the issue of whether section 506(c) gives rise to a private cause of action is a question of first impression in the courts of appeal. Cort instructs us to consider the following factors in determining whether a private remedy is implicit in a statute: whether the plaintiff is in a "class for whose especial benefit the statute was enacted"; whether there is any indication of legislative intent to create or to deny a private remedy; whether a private remedy under the statute would be "consistent with the underlying purposes of the legislative scheme"; and whether inferring a cause of action under the federal statute would be inappropriate due to tradition having relegated such a cause of action to state law. 422 U.S. at 78, 95 S.Ct. at 2087; see also Touche Ross & Co. v. Redington, 442 U.S. 560, 571, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979). Evans, as a copyright owner, is undoubtedly in a class for whose benefit the Copyright Act was enacted. Finding that a private remedy is available under section 506 would not conflict with state authority because of the overall preemptive effect of the statute in the realm of copyright law. See 17 U.S.C. Sec. 301(a). We find, however, that Congress intended that section 506 serve as a criminal statute and not give rise to private actions. The legislative history specifies that "[f]our types of criminal offenses actionable under the bill are listed in section 506...." House Report, supra, at 163, reprinted in 1976 U.S.Code Cong. & Ad.News at 5779 (emphasis added). We also find that permitting private plaintiffs to seek relief under section 506 is inconsistent with the overall scheme of the legislation; private parties have adequate means available by which to seek relief under other provisions of the Act which will yield more appropriate relief.
 
 III. PENDENT STATE CLAIMS
 
 47
 In its appeal of case 81-706, Evans alleges that the actions of CI and Meadows in marketing the Baywood and the Rivendell constituted unfair competition in violation of state common law and the Florida Deceptive and Unfair Trade Practices Act. Fla.Stat.Ann. Secs. 501.201-.213 (West Supp.1985). These claims arise out of allegations that the defendants sent their customers to view Evans' model homes and misrepresented to their customers that their homes and Evans' homes were the same. Evans also included a state common law claim of libel of title arising out of allegations that the defendants affixed their own copyright notice to published copies of the drawings copied from Evans. The district court granted a directed verdict to defendants on the unfair competition claims and denied relief under the libel of title count.
 
 A. Unfair Competition
 
 48
 CI and Meadows argue that Evans' unfair competition claims were not properly before the district court because the federal Copyright Act, 17 U.S.C. Sec. 301(a),[24] preempted them. We address this argument and Evans' objections to the directed verdicts first as to the common law claim and then as to the state statutory claim.
 
 
 49
 1. Common Law Claim.
 
 
 50
 In rejecting defendants' preemption argument, the district court applied the two-prong test set forth by this court in Crow v. Wainwright, 720 F.2d 1224 (11th Cir.1983), cert. denied, --- U.S. ----, 105 S.Ct. 89, 83 L.Ed.2d 35 (1984). In Crow, we explained that the court must determine "whether the rights at issue fall within the 'subject matter of copyright' set forth in sections 102 and 103 and whether the rights at issue are 'equivalent to' the exclusive rights of section 106." 720 F.2d at 1225-26 (citation omitted). The court below found that although Evans' architectural designs fall within the subject matter of copyright, the unfair competition claims involve allegations of misrepresentations about Evans' model homes which do not fall within that subject matter because the buildings are not susceptible to copyright under sections 102 and 103. We agree that this is a proper characterization of the common law unfair competition claim and that it does not fall within the federal statute's subject matter based on our analysis set forth above in footnote 7. The district court also found that the common law tort of unfair competition under Florida law, is not equivalent to the exclusive rights of copyright owners under section 106. The rights provided to a copyright owner by section 106 have been described as the "exclusive rights to do and to authorize (1) the reproduction of copyrighted work (to make copies), (2) the preparation of derivative works based on his copyrighted work, and (3) the distribution of copies of the copyrighted work to the public by sale or other transfer of ownership." Schuchart & Assoc. v. Solo Serve Corp., 540 F.Supp. 928, 943 (W.D.Tex.1982). The court below cited Professor Nimmer's explanation of the test for determining whether a right is equivalent to those provided for in the federal statute:
 
 
 51
 If under state law the act of reproduction, performance, distribution or display, no matter whether the law includes all such acts or only some, will in itself infringe the state created right, then such right is preempted. But if other elements are required, in addition to or instead of, the acts of reproduction, performance, distribution or display, in order to constitute a state created cause of action, then the right does not lie 'within the general scope of copyright,' and there is no preemption.
 
 
 52
 1 Nimmer on Copyright Sec. 1.01[B] at 1-11--1-12 (footnotes omitted). We agree that in order for Evans to prevail on its unfair competition claim under Florida common law, in this case, it must prove elements other than those mandated in an action under the Copyright Act. Florida law requires that Evans establish deceptive or fraudulent conduct of a competitor and likelihood of customer confusion. Stagg Shop of Miami, Inc. v. Moss, 120 So.2d 39 (Fla.2d Dist.Ct.App.1960); Professional Golfers Ass'n v. Banks Life & Casualty Co., 514 F.2d 665, 671 (5th Cir.1975) ("[L]ikelihood of consumer confusion and passing off one's goods or services as those of another constitute the gravamen of the action" under Florida case law.). Rather than going to the question of copying in the manufacture of a product, "[u]nfair competition goes to the question of marketing." B.H. Bunn Co. v. AAA Replacement Parts Co., 451 F.2d 1254, 1263 (5th Cir.1971).
 
 
 53
 Having found that Evans' common law unfair competition claim is not preempted, we reach the question of whether the directed verdict on the claim was proper and turn to the well-settled standard articulated in this court's case law. A district court must decide whether there is sufficient evidence to submit the case to the jury. Boeing Co. v. Shipman, 411 F.2d 365, 373 (5th Cir.1969) (en banc). The court must consider all of the evidence supporting both sides of the case and must view it "in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that reasonable persons could not reach a different conclusion, the Court should direct a verdict." Gregory v. Massachusetts Mutual Life Ins. Co., 764 F.2d 1437, 1440 (11th Cir.1985) (citing Shipman ); Huff v. Standard Life Ins. Co., 683 F.2d 1363, 1366 (11th Cir.1982). If, on the other hand, "there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded [persons] in the exercise of impartial judgment might reach different conclusions, the motion [for a directed verdict] should be denied, and the case submitted to the jury." Shipman, 411 F.2d at 374. The determination is a legal question subject to the same standard of review on appeal as in the trial court. Maxey v. Freightliner Corp., 623 F.2d 395, 397 (5th Cir.1980).
 
 
 54
 The grant of the directed verdict by the court below as to the common law unfair competition claim was based on its determination that the testimony of two defense witnesses established that none of the three factors necessary to prevail on this claim existed: The defendant had not passed off its homes as those of Evans; the public would not have believed there was a connection or endorsement by Evans; and there was not a likelihood of confusion among the customers as to the sources of the homes they viewed. The court relied on the statements by two of CI's sales personnel that they sent customers to see Evans' clients' models "because they were similar, not identical, to the houses defendants were offering for sale." The court stated that it found these two CI employees to be credible witnesses. It also referred to evidence showing that CI's and Meadows' homes were different from those of Evans because of different location, use of different construction materials, different size and price. The district court found that these differences and the fact that CI's personnel did not represent to their customers that the homes were identical were sufficient to warrant a directed verdict on the common law unfair competition claim.
 
 
 55
 Evans points to other parts of the record relevant to the claim but not discussed by the district court. The record includes trial testimony by an investigator hired by Evans to ascertain what CI's employees were telling their customers. His written memorandum of the investigation also was entered into evidence. It asserts that a CI employee told him to visit Evans' models, showed him a photo of CI's copy of Evans' Baywood design and claimed that CI's design was the Parade of Homes winner in Waterbridge where Godfrey's development is located, and told him CI's Autumn design was identical to the model at H. Miller & Sons' development. The district court's failure to consider any of Evans' favorable evidence necessarily contravenes the requirement that the court consider all of the evidence, and that the evidence be considered in the light most favorable to the party opposing the motion. After review of all of the record evidence, we conclude that reasonable persons might reach different results as to whether the defendants were misrepresenting their homes as those of Evans or whether there was a likelihood of consumer confusion as to the source of the homes. The likelihood of confusion necessary to support an unfair competition claim "need not be confusion with respect to the seller's identity;" but can be "confusion with respect to whether the product's source has been approved." Kentucky Fried Chicken Corp. v. Diversified Packaging Corp., 549 F.2d 368, 385 (5th Cir.1977). We do not address further the merits of Evans' claim or of CI's proffered defenses, but are compelled to reverse and remand for a new trial on the common law unfair competition claim in which a jury can weigh the conflicting evidence. We also reverse the district court's ruling precluding punitive damages under the claim and leave that to the court's reconsideration in the course of the proceedings on remand.
 
 
 56
 2. Statutory Claim.
 
 
 57
 Whether the federal Copyright Act preempts Evans' claim under the Florida Deceptive and Unfair Trade Practices Act is a non sequitur on the facts of this case. Evans' failure to specify the basis of his Florida statutory claim is the major stumbling block. Evans apparently did not even clarify the basis of his standing to bring suit as a consumer under the statute. We agree with the district court's holding that the Florida statute was not preempted per se by the federal Copyright Act. The central aim of the Florida statute is to "make consumers whole for losses caused by fraudulent consumer practices." Marshall v. W & L Enterprises Corp., 360 So.2d 1147, 1148 (Fla. 1st Dist.Ct.App.1978). It is intended to protect rights other than those protected by the Copyright Act. We do not agree, however, with the district court's implication that proof of misrepresentation or deceit as would constitute fraud is a necessary element in all causes of action brought under the state statute, see Urling v. Helms Exterminators, Inc., 468 So.2d 451, 453 (Fla. 1st Dist.Ct.App.1985), thereby precluding preemption of any claims thereunder. The Florida statute creates a number of causes of action to protect a number of rights, many of which undoubtedly are not preempted. We are not required, however, to determine preemption on the basis of "hypothetical rights that may truly differ from the exclusive rights of copyright" but rather are "to determine preemption on the basis of the state-created rights Plaintiffs seek to enforce in the case at bar." Schuchart & Assoc. v. Solo Serve Corp., 540 F.Supp. 928, 944 n. 12 (W.D.Tex.1982) (emphasis added). Hence we affirm the district court's directed verdict as to the state statutory claim based on Evans' failure "to establish even a prima facie case under any provision of the [Florida] Act."
 
 B. Libel of Title
 
 58
 The district court dismissed Evans' claim of libel of title because it found that the necessary element of disparaging use was absent. This claim was not properly before the district court at the time it issued the final judgment. The record indicates that as part of Count IV of Evans' amended complaint, it was dismissed by the order dated December 15, 1982. In reviewing the December order of dismissal, however, we find that the court focused exclusively on Evans' effort to bring a private cause of action under 17 U.S.C. Sec. 506 and did not articulate a basis for the dismissal of the libel of title claim. Nor do we find persuasive the rationale articulated in the court's final judgment. The district court addressed the claim as one based on allegations that CI and Meadows represented to their customers that their works and those of Evans were identical. Our review of the record indicates that the claim arises out of allegations that CI published its copies of Evans' work and affixed its own copyright notice to them listing CI as the copyright owner. We reverse the dismissal of this claim and remand for further consideration.
 
 IV. ATTORNEY FEES
 A. Fee Award for Federal Claims
 
 59
 The award of attorney's fees for the federal statutory claims is governed by 17 U.S.C. Sec. 505 which provides:
 
 
 60
 In any civil action under this title, the court in its discretion may allow the recovery of full costs by or against any party other than the United States or an officer thereof. Except as otherwise provided by this title, the court may also award a reasonable attorney's fee to the prevailing party as part of the costs.
 
 
 61
 The language clearly indicates that awarding of fees to the prevailing party is not mandatory.
 
 
 62
 We affirm the district court's denial of attorney's fees on the federal claims, finding no abuse of discretion in its decision to deny the award. We recognize that in this circuit prevailing defendants who are seeking attorney's fees under the Copyright Act need not show that the plaintiff pursued the case in bad faith or that the claims were frivolous. Original Appalachian Artworks, 684 F.2d at 832; see also Diamond v. Am-Law Publishing Corp., 745 F.2d 142 (2d Cir.1984). But see Cooling Systems & Flexibles, Inc. v. Stuart Radiator, Inc., 777 F.2d 485, 493 (9th Cir.1985). We have also noted though that a losing party's good faith and the complexity of the legal issues "likely would justify a denial of fees" to a prevailing party. Original Appalachian Artworks, 684 F.2d at 832. This result is all the more appropriate in the instant case where the plaintiff asserted colorable copyright claims of the type which "section 505 is intended in part to encourage." Diamond, 745 F.2d at 148.
 
 B. Fee Award for Pendent State Claims
 
 63
 Because we have affirmed the dismissal of Evans' Florida statutory claim, we must address the prevailing defendants' claim to attorney's fees thereunder. The statute states in relevant part:
 
 
 64
 (1) In any civil litigation resulting from a consumer transaction involving a violation of this part, except as provided in subsection (5), the prevailing party, after judgment in the trial court and exhaustion of all appeals, if any, shall receive his reasonable attorney's fees and costs from the nonprevailing party.
 
 
 65
 Fla.Stat.Ann. Sec. 501.2105 (West Supp.1985) (emphasis added). We read this language as mandating an award of fees. See Brown v. Gardens By the Sea South Condominium Ass'n., 424 So.2d 181, 184 (Fla. 4th Dist.Ct.App.1983). Because we are remanding the case for consideration of the merits of the pendent common law claims, the district court can also determine the proper amount to be awarded CI and Meadows in connection with the defense of the Florida statutory claim.
 
 V. CONCLUSION
 
 66
 We affirm the denial of relief on the copyright infringement claims and on the Florida statutory claim. We also affirm the denial of attorney's fees in connection with the defense of the federal copyright claims, but reverse the denial of a fee award in connection with the defense of the Florida statutory claim and remand for a determination of the appropriate amount to be awarded. We vacate the directed verdict on the common law unfair competition and libel of title claims and remand to the district court.
 
 
 67
 In light of our disposition of the claims, we raise sua sponte the issue of jurisdiction on remand to preclude further delay. Although only pendent state common law claims remain, the district court may nonetheless properly invoke its jurisdiction in such a case where there has been an investment of judicial resources that offsets the interest in dismissing pendent claims even if the federal claims are dismissed first. O'Connell v. Economic Research Analysts, Inc., 499 F.2d 994, 996 (5th Cir.1974), cert. denied, 419 U.S. 1122, 95 S.Ct. 805, 42 L.Ed.2d 821 (1975). Dismissal at this point would be inequitable and therefore an abuse of discretion. See Pharo v. Smith, 625 F.2d 1226 (5th Cir.1980). Because plaintiffs had properly brought these claims together to save duplicative litigation, they should be timely resolved by the district court.
 
 
 68
 AFFIRMED in part, REVERSED in part, and REMANDED.
 
 
 
 [1]
 At the time suit was filed, the plaintiff corporation was named Donald Frederick Evans and Associates, Inc. It did business under the names Donald Frederick Evans Associates and The Evans Group. Its name has since been changed to The Evans Group
 
 
 [2]
 The defendant corporation Complete Interiors, Inc. does business under the name of Continental Homes. Continental Homes is also named as a defendant in the lawsuits. We use "CI" to refer to both enterprises
 
 
 [3]
 The 1976 Copyright Act, 17 U.S.C. Secs. 101 et seq. is controlling as to all federal statutory claims raised on appeal because all acts relevant to these aspects of the case occurred after the January 1, 1978, effective date of the applicable statutory provisions
 
 
 [4]
 The Eleventh Circuit, in the en banc decision Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981
 
 
 [5]
 Evans based the Sunridge design on a design named the Starshine which Evans had created in 1977 for the Wisconsin Real Estate Trust. The district court's finding that the two designs are substantially similar is not challenged by any party. In our discussion of the merits, we reject the defendants' contention that the Sunridge is an unauthorized copy. We therefore consider them as one design, bearing two names
 
 
 [6]
 The Woodlyn subsequently was renamed the Mulberry according to the court below and the evidence in the record. Neither party disputes that they are in fact two names for the same design
 
 
 [7]
 The district court also included in its list of publications without notice the fact that the Baywood model home was exhibited to the general public without any copyright sign displayed. We do not include this in our calculation of the number of copies published without notice, however
 Public display of a model home must be distinguished from publication of architectural drawings when analyzing the protection afforded by the Copyright Act to the owner of a copyright in the architectural drawings. The copyright owner is vested with certain exclusive rights in the drawings as listed in 17 U.S.C. Sec. 106, including reproduction of, and preparation of derivative works therefrom "so as to instruct a would-be builder on how to proceed to construct the dwelling pictured." Imperial Homes Corp. v. Lamont, 458 F.2d 895, 899 (5th Cir.1972). The copyrighted drawings do not, however, "clothe their author with the exclusive right to reproduce the dwelling pictured." Id.; see also Herman Frankel Org. v. Tegman, 367 F.Supp. 1051 (E.D.Mich.1973). The building itself has "an intrinsic utilitarian function that is not merely to portray the appearance of the article or to convey information," 17 U.S.C. Sec. 101, and as such is an useful article not susceptible to copyright. See Baker v. Selden, 101 U.S. 99, 25 L.Ed. 841 (1880); 1 M. Nimmer, Nimmer on Copyright Sec. 2.08[D] at 2-108.2 (1985) [hereinafter cited as Nimmer on Copyright ]. A builder who constructs a home substantially similar to a dwelling already constructed is not liable for copyright infringement merely based on the substantial similarity if he or she did not engage in unauthorized copying or use of the copyrighted architectural drawings. See 17 U.S.C. Sec. 113(b). In light of this distinction, we do not consider the public display of a model home to constitute a publication of the architectural drawings from which it was constructed. Cf. Imperial Homes Corp., 458 F.2d at 899; DeSilva Constr. Corp. v. Herrald, 213 F.Supp. 184, 195-98 (M.D.Fla.1962).
 
 
 [8]
 Section 102 provides in relevant part:
 (a) Copyright protection subsists, in accordance with this title, in original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated.... Works of authorship include the following categories:
 (1) literary works;
 (2) musical works, including any accompanying words;
 (3) dramatic works, including any accompanying music;
 (4) pantomimes and choreographic works;
 (5) pictorial, graphic, and sculptural works;
 (6) motion pictures and other audiovisual works; and
 (7) sound recordings.
 
 
 [9]
 Section 411 provides in relevant part:
 ... no action for infringement of the copyright in any work shall be instituted until registration of the copyright claim has been made in accordance with this title....
 
 
 [10]
 The Copyright Act expressly distinguishes between ownership in the work copyrighted and ownership in the copyright for a work:
 Ownership of a copyright, or of any of the exclusive rights under a copyright, is distinct from ownership of any material object in which the work is embodied. Transfer of ownership of any material object, including the copy ... in which the work is first fixed, does not of itself convey any rights in the copyrighted work embodied in the object....
 17 U.S.C. Sec. 202.
 
 
 [11]
 The district court found that the Morning Glory 1F is substantially similar to the Baywood; the Autumn IIIE is substantially similar to the Rivendell; the Riverwood is substantially similar to the Sunridge; the Highlander is substantially similar to the Woodlyn; and the Morning Star is substantially similar to the Hollybrooke
 
 
 [12]
 See supra note 7
 
 
 [13]
 The absence of notice on the brochures also would be relevant to the defendants' argument that they did not know that the plans in the Moss Pointe brochure and Parade of Homes supplements were copyrighted when they used them to create their own plans. Such a claim would relieve the defendants from "liability for actual or statutory damages under section 504 for any infringing acts committed before receiving actual notice that registration for the work ha[d] been made under section 408, if [the defendants proved they were] misled by the omission of notice." 17 U.S.C. Sec. 405(b). In light of our finding that the defendants are not liable for infringement because of Evans' forfeiture, however, we do not address this claim of innocent infringement
 
 
 [14]
 The Report explains that
 [u]nder the present law [the 1909 Act] the copyright notice serves four principal functions:
 (1) It has the effect of placing in the public domain a substantial body of published material that no one is interested in copyrighting;
 (2) It informs the public as to whether a particular work is copyrighted;
 (3) It identifies the copyright owner; and
 (4) It shows the date of publication.
 
 
 [15]
 17 U.S.C. Sec. 404 provides:
 (a) A separate contribution to a collective work may bear its own notice of copyright, as provided by sections 401 through 403. However, a single notice applicable to the collective work as a whole is sufficient to satisfy the requirements of sections 401 through 403 with respect to the separate contributions it contains (not including advertisements inserted on behalf of persons other than the owner of copyright in the collective work), regardless of the ownership of copyright in the contributions and whether or not they have been previously published.
 (b) Where the person named in a single notice applicable to a collective work as a whole is not the owner of copyright in a separate contribution that does not bear its own notice, the case is governed by the provisions of section 406(a).
 
 
 [16]
 To the extent that the district court found that the appearances in the Parade of Homes were without copyright notice because they were advertisements, we affirm its reasoning. We reject, however, its statement that because the Sentinel, rather than Evans, owns the copyright in the newspaper, the Sentinel's front page copyright notice did not protect Evans' work. If Evans' work had not been an advertisement, but rather an independent work submitted to the newspaper, the fact that the Sentinel owned the copyright and was listed in the notice would not have precluded the notice from protecting Evans' copyright. Under 17 U.S.C. Sec. 404(b), it simply would have been treated as an error in the name listed in the notice in accordance with Sec. 406(a)
 
 
 [17]
 The Sentinel's copyright notice comported with the prescribed notice of Sec. 401(b). It included the copyright symbol, year of publication, and listed the name of the copyright owner
 
 
 [18]
 The relevant contract provision states:
 
 
 [6]
 4 Ownership of Documents--the architect hereby expressly reserves his copyright and other property rights in the project documents. These documents are not to be reproduced, changed, or copied in any form or manner whatsoever without first obtaining the express written permission and consent of the architect, nor are they to be assigned to any party without first obtaining said written permission and consent
 
 
 [19]
 The Eleventh Circuit, in Stein v. Reynolds Securities, Inc., 667 F.2d 33 (11th Cir.1982), adopted as precedent decisions of the former Fifth Circuit, Unit B, rendered after September 30, 1981
 
 
 [20]
 In Original Appalachian Artworks, the record revealed that approximately 400 of the soft sculpture dolls in which copyright was claimed only bore notices of copyright on their detachable name tags. 684 F.2d at 827. The remainder of the 40,000 dolls had a proper sewn-in copyright notice. Id. The approximately 40 dolls at issue which bore no copyright notice were found to be substantially different than the copyrighted dolls and therefore had no effect on the copyright. Id. at 823-25
 
 
 [21]
 CI and Meadows argue on appeal that at trial Evans waived its right to cure the omission as to the Olin-American designs. Because we find that Evans' actions did not meet the reasonable effort standard, it is unnecessary for us to reach the waiver issue
 
 
 [22]
 There is a dispute among the courts as to whether Sec. 405(a)(2) requires that once a copyright owner discovers that notice was omitted from some copies distributed, then the owner must make a reasonable effort to attach notice to all copies distributed, or whether it simply requires that once the owner makes such a discovery, then he or she must make a reasonable effort to attach notice to all copies distributed thereafter. The district court below relied on Beacon Looms, Inc. v. Lichtenberg & Co., 552 F.Supp. 1305 (S.D.N.Y.1982) and applied the first interpretation. There is also lower court authority within that same circuit adopting the second approach. Innovative Concepts In Entertainment, Inc. v. Entertainment Enterprises Ltd., 576 F.Supp. 457 (E.D.N.Y.1983). The statutory language is ambiguous and could support either interpretation. The legislative history lends support to the latter interpretation. "The second condition established by clause (2) is that the copyright owner make a 'reasonable effort,' after discovering the error, to add the notice to copies or phonorecords distributed thereafter." House Report, supra, at 147, reprinted in 1976 U.S.Code Cong. & Ad.News at 5763. Neither party has referred us to any appellate authority which supports either of the interpretations. Some of the lower courts in this circuit apparently have been persuaded to adopt the second approach. See, e.g., O'Neill Developments, Inc. v. Galen Kilburn, Inc., 524 F.Supp. 710 (N.D.Ga.1981); Sherry Manufacturing Co. v. Towel King of Florida, Inc., 220 U.S.P.Q. 855 (S.D.Fla.1983). In Original Appalachian Artworks, 684 F.2d at 827, this court refused to find that a reasonable effort had been made because the trial court had not made any finding on the issue and the record revealed no evidence of an effort "to add notice to all copies distributed without proper notice." We take issue with CI and Meadows' characterization of that language as a decision by this circuit to adopt the first interpretation. Our decision in that case turned on a finding that a relatively few copies of the work had been distributed and we did not rely on a determination of the reasonable effort question. So too in this case, we do not reach beyond the analysis necessary to the resolution of this case to resolve the question of federal statutory interpretation. The Nevada district court has taken a similar case-by-case approach and recognized that "the reasonable effort test implicitly recognizes that there are limits to what the copyright owner can do to add notice. For example, in many cases it would be unreasonable to expect him to engage in a futile attempt to add notice to all copies of a work that had been distributed to the public. [The copyright owner] would not be expected to locate copies that had passed out of his control." Videotronics, Inc. v. Bend Electronics, 586 F.Supp. 478, 483 n. 11 (D.Nev.1984)
 
 
 [23]
 Section 506(c) provides:
 (c) Fraudulent copyright Notice.--Any person who, with fraudulent intent, places on any article a notice of copyright or words of the same purport that such person knows to be false, or who, with fraudulent intent, publicly distributes or imports for public distribution any article bearing such notice or words that such person knows to be false, shall be fined not more than $2,500.
 
 
 [24]
 17 U.S.C. Sec. 301 provides in relevant part:
 (a) On and after January 1, 1978, all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103, whether created before or after that date and whether published or unpublished, are governed exclusively by this title. Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State.
 (b) Nothing in this title annuls or limits any rights or remedies under the common law or statutes of any State with respect to--
 (1) subject matter that does not come within the subject matter of copyright as specified by sections 102 and 103, including works of authorship not fixed in any tangible medium of expression; or
 (2) any cause of action arising from undertakings commenced before January 1, 1978; or
 (3) activities violating legal or equitable rights that are not equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106.