Trolene DODD; Chris Boerner by His Next Friend, Fred Boerner; Beth Haynes, by Her Next Friend Larry Haynes; Margie Williams, by Her Next Friend Bettye Williams; Catherine Elsken, by Her Next Friend Mary Elsken; David A. Crook, by His Next Friend S.L. Crook; Arlis N. Young, by His Next Friend Arlis Young; Robert L. Ledbetter, by His Next Friend Larry Murry; Janice Baker, by Her Next Friend William Campbell; Wendell "Dirk" Brantley, by His Next Friend Dorothy Brantley, and Natalie Brown, by Her Next Friend Viola Brown, Plaintiffs,

v.

FORT SMITH SPECIAL SCHOOL DISTRICT NO. 100, Richard L. Mulloy, Jackie M. Farrar, and the William O. Darby Memorial Book Foundation, Defendants.

Civ. No. 87–2090.

United States District Court,
W.D. Arkansas,
Fort Smith Division.

July 27, 1987.

---

Douglas M. Carson, Daily, West, Core, Coffman & Canfield, Fort Smith, Ark., for plaintiffs.

Betsy Hall, of Hardin, Jesson & Dawson, P.K. Holmes, of Warner and Smith, Fort Smith, Ark., for defendants.

## MEMORANDUM OPINION

H. FRANKLIN WATERS, Chief Judge.

The court has before it a motion for preliminary injunction or temporary restraining order. This case presents a very unique factual situation—one which cannot be properly appreciated from an examination of the pleadings and other documentation in the file. A hearing on the motion was held June 10, 1987.

The controversy at hand emanates from a manuscript entitled "Portrait of a Hero, William Orlando Darby" and a derivative work allegedly "created" from it entitled "William Orlando Darby: A Man to Remember." William Orlando Darby was born and reared in Fort Smith, Arkansas. Darby was ranked among the most outstanding and brilliant combat commanders of World War II. He was responsible for organizing the 1st Ranger Battalion that was activated in June, 1942, and became known as Darby's Rangers. Darby Junior High bears his name to pay tribute to his outstanding military career.

There is no dispute that the original idea for the book came from Trolene Dodd, one of the plaintiffs in this action. From that point on, however, almost every aspect of

the creation of the book is contested by the parties which resulted in the present lawsuit being filed on May 18, 1987.

Ms. Dodd conceived the idea to create a book on Darby shortly after being hired by the Fort Smith Special School District to act as a journalism and speech teacher at Darby Junior High. The idea of creating a book as a type of student effort was presented to Principal Mulloy. Principal Mulloy approved of the idea but allegedly informed Ms. Dodd that no school money could be committed to the project and that it would have to be entirely self-supporting.

At the beginning of the 1985–86 school year, Ms. Dodd presented the idea to her journalism class, telling the students that it would involve a considerable amount of effort and would require work above and beyond regular classroom assignments. Ms. Dodd and her students felt it was important that the students at Darby Junior High and members of the community become aware of some of the history of Darby.

According to the testimony given at the hearing, the project was looked on as a student enterprise. The students, with the supervision and a considerable amount of help from Ms. Dodd, set about raising the necessary funds and gathering information on the life of Darby. The necessary funding was raised by selling advertising space to area merchants. The spaces were sold with the promise that the ads would be placed throughout the book rather than being grouped together—giving the advertisers the best "buy" for their money. Once the advertising space was sold, the students created the ads from information conveyed by the advertisers. The testimony showed that Principal Mulloy was aware of the student funding activity. In fact, it was agreed that Ms. Dodd could present an award to the student selling the most space. The money that was raised was placed in the journalism activity account which was accessed through the school secretary. This account had a zero balance at the beginning of the school year—prior to the ad selling campaign.

The students and Ms. Dodd began a series of activities to collect information about Darby. The focus of the book was to be on the childhood and young adulthood of Darby prior to his becoming a war hero. This was partly because of the existence of several other books and a film which covered Darby's war years. This process of collecting the necessary information included public service announcements on radio and television, personal interviews with various members of the community who had known Darby, television appearances on a local show, gathering and in some cases taking photographs, researching pre-existing materials, and gathering information from various places where Darby had lived and worked.

Once the information was gathered, the students and Ms. Dodd began the process of compiling, creating, and editing the various works. Toward the last few weeks of school, Ms. Dodd and the student editors compiled the manuscript and selected a title. At this time the manuscript was handwritten.

Defendants contended Principal Mulloy had made it a condition that the Rangers approve the manuscript prior to publication and that the Rangers had rejected the manuscript. However, the testimony at the hearing established that at some point in the summer, Ms. Dodd forwarded the new materials the students had gathered to a member of the Ranger Foundation who found nothing objectionable in the new materials. Ms. Dodd felt that this was not a condition but rather a gesture of courtesy to the members of the Ranger Foundation and stated that she had a high regard for their opinion. As later testimony showed, when Mulloy and Farrar presented the manuscript to the Rangers seeking funding, a member of the Rangers expressed a desire to omit the ads and perhaps make some other changes if the Ranger Foundation was to fund the project. There was no rejection of the manuscript. The suggestions were made in the context of the Rangers providing funding.

After the materials were returned, Ms. Dodd arranged for the manuscript to be

typed. She was later reimbursed for this expenditure from the funds placed in the activity fund. Several more steps were necessary prior to the manuscript being print ready. Once it was completed, Ms. Dodd placed the manuscript in a printer's hands to receive estimates. The plan was to have as many copies printed as there was money left from the ad campaign. Printing was to begin in the first part of October.

During the summer months, Ms. Dodd had resigned from her position with the school for personal reasons. At this point, after the book had been given to the printers, Principal Mulloy and Ms. Farrar approached Ms. Dodd and asked to see the book. Ms. Dodd got the manuscript back from the printer and allowed Mulloy and Farrar to look it over. Mulloy expressed dissatisfaction with the ads and especially with their being scattered throughout the book. When Ms. Dodd informed Mulloy and Farrar that the available money would only cover the cost of printing approximately 150 copies of the book, they expressed the desire to have at least 1,000 copies made. Some of the copies would be taken to Italy during a visit planned with Fort Smith's sister city, Cisterno, Italy.

Mulloy presented what appeared to be a solution to the funding problem. The suggestion was that he and Farrar would take the manuscript around and get some estimates of printing costs and solicit donations. Ms. Dodd agreed on the condition that she be allowed a final proof reading prior to printing. The only change discussed was the possibility of moving all the ads to the back of the book. Ms. Dodd was to get an estimate from her printer for 1,000 copies which she did and this estimate was verbally communicated to Farrar.

From this time on, the manuscript was out of the hands of Ms. Dodd and the students. Approximately one month later, Ms. Dodd contacted Mr. Mulloy and was told the ads would be left out altogether. Upon hearing this, Ms. Dodd suggested it would be necessary to contact the advertisers and offer their money back. Around the first part of December, Ms. Dodd first became aware that substantive changes were being made in the manuscript. It had been given to Mr. Altieri (an ex-Darby Ranger) for proofreading and he was also writing a section to be added to the book. Early in February Ms. Dodd was informed that the book was at the printers. Ms. Dodd testified that she had been informed by several people of changes in the book and that she became alarmed when she learned of an article appearing in the Southwest Times Record on April 24, 1987, in which an award was presented to Ms. Farrar for helping to preserve the historical heritage of Fort Smith. This same article stated that Ms. Farrar authored a book, "William Orlando Darby: A Man to Remember."

Ms. Dodd contacted Dr. Owen, the school's assistant superintendent, and expressed her concern that she and the students had authored the book and were not being given credit. Ms. Dodd further informed him that she was going to speak with Principal Mulloy that day. At this meeting, Ms. Dodd expressed her concern that the students were not being given proper credit. Mr. Mulloy felt that it was too late in the printing process and too expensive at this point to alter the author page in the book.

There was some additional discussion concerning the fact that the students had not been listed as authors in the original manuscript. In the manuscript what is considered the author page stated: "The 1985–86 Darby Journalism staff contributed many hard hours compiling this booklet." Below this statement the students' names were listed. In the printed book, "William Orlando Darby: A Man to Remember," the author page states it was "prepared and edited by Ms. Jackie Marie Farrar." Ms. Farrar's name is also listed on the spine of the book. A declaratory statement appears on page V which states the 1985–86 class under the direction of Ms. Dodd, "began the project of compiling a booklet on Bill Darby." A comparison of the manuscript and printed book reveals that much of the printed book has been "lifted" from the manuscript.

At Mulloy's suggestion, Ms. Dodd talked to Farrar concerning the lack of authorship credit being given to the students; little was accomplished at this meeting. According to Ms. Dodd's testimony, when she requested the original manuscript back, she was informed that it had been thrown away or destroyed. To date, Ms. Dodd has not received back her copy of the original manuscript.

As a result of Ms. Dodd's concern, and with the aid of Ms. Kramer, the president of the Fort Smith Classroom Teachers Association, a meeting was arranged with Dr. Goodin, the Superintendent, at which time Ms. Dodd was allowed to express her concern over the lack of credit being given to the students. Dr. Goodin directed Dr. Owen to prepare and insert a supplemental page into the printed book listing the students by name. This was done by inserting a sticker into the book containing the names of the students and the statement that the original idea and sponsor was Trolene Dodd.

It should be noted that the printed version of the book has been copyrighted in the name of the William O. Darby Memorial Book Fund. The "copyright holder" is apparently a non-existent entity in that it is merely the name of the checking account from which the printer was paid.

Ms. Dodd and the students who are plaintiffs in this action feel that they are not being given proper "authorship" credit for the creation of the book. In the words of one student who testified at the hearing, the credit given makes it "sound like we were just helpers, there to run errands." The complaint alleged that this course of conduct constituted a violation of the Copyright Act, 17 U.S.C. § 502, the Lanham Act, 15 U.S.C. § 1125, and 42 U.S.C. § 1983. A state law claim for conversion or misappropriation was also alleged.

At the conclusion of the hearing discussed above, the court, having some doubts as to whether subject matter jurisdiction existed in this case, requested the parties to brief several issues. This court, after having examined the briefs of the parties, has determined for the reasons stated below that subject matter jurisdiction is proper under the Lanham Act but not under the Copyright Act or section 1983.

## I. Subject Matter Jurisdiction

Under the Copyright Act, 17 U.S.C. § 101 et seq., registration of the copyright, while not a prerequisite to having a protectable interest, is a jurisdictional prerequisite to the initiation of an infringement suit in federal court. 17 U.S.C. §§ 408(a) and 411. An infringement suit is any suit brought to enforce or protect the exclusive rights granted to copyright owners under the act. These exclusive rights include reproduction, adaptation, distribution, performance and display. 17 U.S.C. § 106. This Act has preempted all common law copyright protection that is equivalent to the protection granted by the Act. 17 U.S.C. § 301(a).

■ Since registration is a prerequisite to an infringement suit, subject matter jurisdiction in this suit cannot be premised on the Copyright Act as neither Ms. Dodd nor her students have registered their alleged copyright. Admittedly, this lack of registration is a result of the defendants' retention of the only copy of the manuscript, however, the Copyright Act does not provide any exceptions from the registration requirement.

A somewhat more complex question was presented by plaintiffs' assertion that they have been deprived under color of state law of a property and/or liberty interest and therefore have a cause of action based on 42 U.S.C. § 1983. Plaintiffs argue that a 1983 claim is appropriate, based on the deprivation of a property right, i.e., the unregistered copyright held by them, and a denial of the right of access to the courts premised on the retention by the defendants of the only copy of the manuscript thereby denying them access to federal court for copyright infringement.

The framework for analysis of 1983 claims premised on violations of federal statutory law has developed since *Maine v. Thiboutot*, 448 U.S. 1, 100 S.Ct. 2502, 65

L.Ed.2d 555 (1980). In *Thiboutot,* the Supreme Court made clear that section 1983 encompassed claims based on purely statutory violations of federal law. *Id.* at 5, 100 S.Ct. at 2504.

The practical effect of *Thiboutot* was later limited by the Supreme Court in *Middlesex County Sewerage Authority v. National Sea Clammers Association,* 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981), and *Pennhurst State School and Hospital v. Halderman,* 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981). These cases and their progeny direct the court to examine whether Congress intended the statutory enactment to be the exclusive vehicle through which the rights granted are enforced and, if this hurdle is passed, whether the statute at issue was the kind that created enforceable "rights" under section 1983.

In making the initial determination, *i.e.,* whether the statute provides the exclusive remedies, it must be discerned whether the parties are attempting to enlarge or circumvent existing remedies and enforcement schemes or whether the claim presented constitutes a separate and distinct constitutional claim. *Smith v. Robinson,* 468 U.S. 992, 1005, 104 S.Ct. 3457, 3464–65, 82 L.Ed.2d 746 (1984); *Moore v. Warwick Public School Dist. No. 29,* 794 F.2d 322 (8th Cir.1986).

Plaintiffs assert that the governmental actions constitute interference even apart from the infringement of the literary material. An examination of the Copyright Act reveals that it was the intent of Congress to do away with the dual system of copyright that existed under the old act. Under the Copyright Act of 1976 protection is extended to unpublished works. Fixation is now the trigger mechanism which terminates common law copyright and activates federal statutory copyright. 17 U.S.C. § 301(b)(1). Under section 301(a), Congress provided for the preemption of all state and common law rights that are the "equivalent to any of the exclusive rights within the general scope of copyright." 17 U.S.C. § 301(a). Chapter 5 of the Act provides a comprehensive enforcement scheme and remedies for infringement of copyright. 17 U.S.C. § 501 *et seq.*

■ An examination reveals that the gravamen of the complaint is premised on a violation of the exclusive rights granted a copyright holder under the Copyright Act. The complaint alleges that defendants without consent created a derivative work from "Portrait of a Hero," reproduced the work, wrongfully identified the author, and announced the intention to distribute the work (in fact, after the complaint was filed some copies were distributed). When "a state official is alleged to have violated a federal statute which provides its own comprehensive enforcement scheme, the requirements of that enforcement procedure may not be bypassed by bringing suit directly under section 1983." *Sea Clammers* at 20, 101 S.Ct. at 2626 (quoting the dissenting opinion of Justice Stewart in *Chapman v. Houston Welfare Rights Organization,* 441 U.S. 600, 673 n. 2, 99 S.Ct. 1905, 1945 n. 2, 60 L.Ed.2d 508 (1979)).

In reaching this decision the court is mindful of the explosion of causes of action under section 1983. It should also be noted that the Eighth Circuit has previously warned against the broad expansion of section 1983. *First Nat. Bank of Omaha v. Marquette Nat. Bank,* 636 F.2d 195 (8th Cir.1980), *cert. denied,* 450 U.S. 1042, 101 S.Ct. 1761, 68 L.Ed.2d 240 (1981). Although such a decision seems harsh in this case, Congress' clear intent was to bring all copyright actions within the provisions of the Copyright Act. At the same time registration was made a jurisdictional prerequisite to an infringement action in federal court. To allow this suit under section 1983 would provide a method whereby plaintiffs could bypass the registration requirement.

■ Plaintiff, Ms. Dodd, also asserts a deprivation of property and/or liberty interest in her reputation. The Supreme Court in *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), rejected the view that an individual had a liberty or property interest in their reputation alone. Reputation alone "apart from some more tangible interest such as employment," is

neither a "liberty" nor "property" interest by itself sufficient to invoke the procedural protection of the Due Process Clause. *Id.* at 701, 96 S.Ct. at 1160. Here the plaintiff has failed to demonstrate such a tangible interest.

Similarly, we reject the plaintiffs' argument that they have been denied access to the courts. The right to access has been premised on various sources under the constitution including the first amendment, the due process clause, and the privileges and immunities clause of Article 4. It is regarded as "one aspect of the right of petition." *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 510, 92 S.Ct. 609, 611, 30 L.Ed.2d 642 (1972). This right, however, is limited by the prescribed procedures for initiating the action. *Id.* at 515, 92 S.Ct. at 614.

The right has never been extended to give plaintiffs access to courts in all situations. Every wrong does not bring with it the right to litigate in federal court. Based on the foregoing discussion, this court believes that it does not have subject matter jurisdiction under section 1983.

Plaintiffs' third alleged basis for jurisdiction is a violation of the Lanham Act. 15 U.S.C. § 1125(a). Section 43(a), now codified at 15 U.S.C. § 1125(a), provides in pertinent part:

> Any person who shall affix, apply, or annex, or use in connection with any goods or services, ... a false designation of origin, or any false description or representation, ... and shall cause such goods or services to enter into commerce ... shall be liable to a civil action ... by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

Initially, the court had some reservations concerning the applicability of the Lanham Act to a case where there was no trademark and no market competition involved. However, after a closer examination, the court has altered its position. The purpose of this particular section is to protect the consumers or any person who is likely to be damaged by its use from a false designation of origin or a false description. *See*

*PPX Enterprises, Inc. v. Audiofidelity Enterprises, Inc.,* 818 F.2d 266 (2d Cir. 1987); *Smith v. Montoro,* 648 F.2d 602 (9th Cir.1981); *Marling v. Ellison,* 218 U.S.P.Q. 702 (S.D.Fla.1982); *Nature's Bounty, Inc. v. Basic Organics,* 432 F.Supp. 546 (E.D.N. Y.1977). The basic aim being to prevent consumer deception.

In fact, the existence of a trademark is not necessary or controlling in an action brought under section 43(a). *Black Hills Jewelry Mfg. Co. v. Gold Rush, Inc.,* 633 F.2d 746 (8th Cir.1980); *New West Corp. v. NYM Co. of California, Inc.,* 595 F.2d 1194 (9th Cir.1979); *Unital, Ltd. v. Sleepco Mfg., Ltd.,* 627 F.Supp. 285 (W.D.Wash. 1985); *Potato Chip Institute v. General Mills, Inc.,* 333 F.Supp. 173 (D.Neb.1971), *aff'd,* 461 F.2d 1088 (8th Cir.1972).

Likewise, courts have held that there need not be any direct market competition. *PPX Enterprises, Inc. v. Audiofidelity Enterprises, Inc.,* 818 F.2d 266 (2d Cir. 1987); *Springs Mills, Inc. v. Ultracashmere House, Ltd.,* 724 F.2d 352 (2d Cir. 1983); *CNA Financial Corp. v. Local 743 of Int'l Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America,* 515 F.Supp. 942 (N.D.Ill.1981). As noted by the court in *Black Hills,* "section 43(a) creates a federal statutory tort *sui generis* and does not merely codify the common law principles of unfair competition." *Black Hills Jewelry Mfg. Co. v. Gold Rush, Inc.,* 633 F.2d 746 (8th Cir. 1980).

Somewhat similar circumstances were addressed by the court in *Smith v. Montoro,* which concerned an actor whose name was left off the film credits and another actor's name substituted prior to distribution of the film in the United States. *Smith v. Montoro,* 648 F.2d 602 (9th Cir. 1981). In finding the existence of a Lanham Act violation the court relied on the concept of reverse palming off. Reverse palming off consists of conduct whereby the defendant purchases or otherwise obtains the plaintiff's goods, removes plaintiff's name and replaces it with his own. *Id.* at 606. As a result of such reverse palming off, "the ultimate purchaser (or

viewer) is deprived of knowing the true source of the product and may even be deceived into believing that it comes from a different source." *Id.* at 607.

*Marling v. Ellison*, 218 U.S.P.Q. 702 (S.D.Fla.1982), involved a false designation of authorship. There plaintiff argued that Ellison had falsely represented that he was the author of his infringing works and, therefore, had violated section 43(a) of the Lanham Act. The court noted that the books stated on the back cover that Ellison was the author even though they were in considerable part the result of the copying of the plaintiff's work. *Id.* at 714. One well-known treatise has suggested that any author may claim a violation of section 43(a) of the Lanham Act if his work is published without his name. M. Nimmer, *Nimmer on Copyright* § 8.21(e).

■ The plain meaning of the statute supports the court's finding of jurisdiction in this matter. Section 43(a) gives a cause of action to "any person who believes that he is or is likely to be damaged by the use of any such false description or representation." The challenged false representation in the case at hand is the credit given to Ms. Farrar as being the preparer and editor of the book. Clearly plaintiffs fall within the scope of section 43(a).

II. *Injunction*

■ The issuance of a preliminary injunction is governed by the four-part standard outlined by the Eighth Circuit in *Dataphase Systems, Inc. v. C.L. Systems, Inc.*, 640 F.2d 109 (8th Cir.1981) (en banc). An injunction is regarded as an extraordinary remedy which should not be granted unless the movant demonstrates: (1) a threat of irreparable harm; (2) that the state of balance between the harm likely to be suffered by the movant and the injury the injunction will inflict on other parties favors the movant; (3) a probability that the movant will succeed on the merits; and (4) that the public interest favors the granting of the injunction.

"At base, the question is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Id.* at 113. No single one of the factors is dispositive and the court's approach must be "flexible enough to encompass the particular circumstances of each case." *Id.*

In addition to the guidance given courts by the *Dataphase* case, the Eighth Circuit has reviewed the propriety of an injunction under the Lanham Act. *Black Hills Jewelry Mfg. Co. v. Gold Rush, Inc.*, 633 F.2d 746 (8th Cir.1980). "To obtain an injunction under section 43(a) appellees need only show that the falsities complained of had a tendency to deceive. (citations omitted). A finding of tendency to deceive satisfies the requisite of irreparable harm." *Id.* at 753.

The congressional policy behind this section of the Lanham Act was protection of the public from false and misleading information. An injunction serves to protect not only the plaintiff but also potential consumers. *See Black Hills* at 753 n. 7. This case differs from what might be considered the typical Lanham Act case. The confusion here is not caused by a comparison of two products both in the public domain. Here the "confusion" is the result of the alleged false representation of Ms. Farrar as the preparer and editor of the work in question. Undoubtedly, the public would have no reason to doubt or question the statement in the book that Ms. Farrar was responsible for these activities. Ms. Farrar would be receiving credit or at least part of the credit rightfully belonging to others.

For the foregoing reasons, this court finds that it has subject matter jurisdiction and that the defendants should be and hereby are enjoined from distributing or further advertising the book entitled "William Orlando Darby: A Man to Remember" until a trial on the merits has resolved the disputed issues. A separate order in accordance herewith will be entered contemporaneously with the filing of this opinion.