**M.G.B. HOMES, INC.,**
**Plaintiff–Appellee,**

**v.**

**AMERON HOMES, INC., and Daniel**
**James Brognano,**
**Defendants–Appellants,**

**Rick Brognano and Richard**
**Patton, Defendants.**

No. 88–5108.

United States Court of Appeals,
Eleventh Circuit.

June 25, 1990.

Before TJOFLAT, Chief Judge, JOHNSON, Circuit Judge, and BROWN,[1] Senior Circuit Judge.

JOHN R. BROWN, Senior Circuit Judge:

MGB Homes, Inc. (MGB), in its initial complaint, alleged that Ameron Homes, Inc. and its President Daniel J. Brognano (Ameron) copied the floorplan of MGB's "Islander II" home from a copyrighted advertising flyer. MGB alleged copyright infringement in violation of the Copyright Act of 1976, 17 U.S.C. § 501, *et seq.*, and violations of the Florida common law of unfair competition and the Florida Deceptive and Unfair Trade Practices Act (DTPA), Fla.Stat.Annot. § 501.201, *et seq.* (1973). The trial court found in favor of MGB on all counts and awarded actual damages under the Copyright Act of $1,206.99. It also awarded $5,000.00 in punitive damages and $15,000.00 in attorneys' fees for "unfair competition" and violations of the Florida DTPA.

We reverse the trial court on each of these claims leading to reversal of all of the monetary awards.

### The House that Ameron Built

With one important exception, we find that the trial court was not clearly erroneous in its findings of facts below and thus adopt those findings for purposes of this appeal.[2]

MGB and Ameron are competing home builders in the town of Sebastian, Florida. The principals of both MGB and Ameron, Ballough and Brognano respectively, were once shareholders and controllers of Amer-

John Cyril Malloy, James E. Wetterling, Jr., Jennie S. Malloy, Miami, Fla., for defendants-appellants.

Eugene F. Malin, Kevin P. Crosby, Ft. Lauderdale, Fla., for plaintiff-appellee.

1. Honorable John R. Brown, Senior U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

2. We do not adopt the trial court's "finding" that MGB was the author of the advertising flyer at issue here. Although the trial court characterized that as an issue of fact, we reverse the trial court's ruling because of its incorrect legal analysis. *See infra.* While we agree with the trial court that MGB was the "author of the concept" for the "Islander II" home, we do not agree that the "expression of the concept ... was a result of [MGB's] expertise and work." As a necessary adjunct, we also disagree with the court's finding that Unlimited Drafting Service (whom we find to be the author of the advertising flyer, *see infra*) was "more than a scrivener, but less than an author."

on. In this action, MGB claims that Ameron copied one of its floor plans—for an "Islander II" home—which was registered with the Copyright Office. The plan appeared on an advertising flyer prepared by Unlimited Drafting Services, Inc. (Unlimited), along with an artist's rendition of the outside of the home and some text about the home. The brochure was labelled a "home drawing" and was classified among the "Works of the Visual Arts."

MGB claims that the floor plan depicted on that advertising brochure and the measurements given thereon were used by Ameron's draftsman to make the architectural drawings of a home Ameron built for Mr. and Mrs. Mark Stern.[3] Ameron's Brognano denied this contention and testified that he had actually physically measured and sketched a home like the "Islander II" model and that his draftsman had drawn the Sterns' house plans from that. This testimony was discredited by Brognano's son. The son's testimony was in turn clouded by the fact that he had just previously received a $1,500.00 gift from the president of MGB, Mr. Ballough.

In light of this testimony, the trial court found that Brognano attempted to mislead the court by fabricating a story about sketching and measuring an actual home. It found that "Ameron Homes, Inc. did

appropriate and use the copyrighted floor plan of plaintiff [MGB]." (R. 96).

MGB admitted that the actual architectural plans for the "Islander II" were never registered with the Copyright Office although they do bear a copyright notice. Only the advertising flyers were registered.

Ameron had access to the advertising flyers for the "Islander II" which were available in the model home for prospective customers. Ameron constructed a home for the Sterns which has a floor plan substantially similar to the "Islander II." The differences are insignificant. The Sterns' floor plan was copied from the advertising flyer for the "Islander II" home.

### A Well–Built Plan?

The Copyright Act provides that:

no action for infringement of the copyright in any work shall be instituted until registration of the copyright claim has been made in accordance with this title.

17 U.S.C. § 411(a) (West Supp.1990). The registration requirement is a jurisdictional prerequisite to an infringement suit.[4]

The existence of federal jurisdiction was strongly debated in this case. MGB filed its original application for copy-

---

**3.** The record shows that the Sterns met Brognano of Ameron, liked him, and decided he would be their builder. Later that day, they saw MGB's "Islander II" and decided that was the house they wanted. They returned to Brognano and asked him to build that house. Brognano testified that he told them he could not build that house, but he would build them something similar.

**4.** *See, e.g., Haan Crafts Corp. v. Craft Masters, Inc.,* 683 F.Supp. 1234, 1242 (N.D.Ind.1988) ("[A] lawsuit for copyright infringement cannot be filed unless plaintiff has a *registered* copyright.... This is a jurisdictional requirement which must be satisfied before a federal court can entertain a copyright infringement claim."); *Demetriades v. Kaufmann,* 680 F.Supp. 658, 661 (S.D.N.Y.1988) ("Receipt of an actual certificate of registration or denial of same is a jurisdictional requirement, and this court cannot prejudge the determination to be made by the Copyright Office."); *Dodd v. Fort Smith Special School District No. 100,* 666 F.Supp. 1278, 1282 (W.D.Ark.1987) ("Under the Copyright Act ... registration of the copyright, while not a prerequisite to having a protectable interest, is a juris-

dictional prerequisite to the initiation of an infringement suit in federal court."); *Quincy Cablesystems, Inc. v. Sully's Bar, Inc.,* 650 F.Supp. 838, 850 (D.Mass.1986) ("Copyright registration under § 411(a) is a condition precedent to filing an infringement action."); *Wales Industrial, Inc. v. Hasbro Bradley, Inc.,* 612 F.Supp. 510, 515 (S.D.N.Y.1985) ("Registration of a copyright claim is a jurisdictional prerequisite to a suit for infringement."); *Conan Properties, Inc. v. Mattel, Inc.,* 601 F.Supp. 1179, 1182 (S.D.N.Y.1984) ("Without registration of the copyrights the suit is barred and absent an allegation that the copyrights have been registered the complaint is defective."); *Techniques, Inc. v. Rohn,* 592 F.Supp. 1195, 1197 (S.D.N.Y.1984) ("Pursuant to 17 U.S.C. § 411(a) ... it has been held repeatedly that ownership of a copyright Registration is a jurisdictional prerequisite to an action for infringement."); and *International Trade Management, Inc. v. United States,* 1 Cl.Ct. 39, 553 F.Supp. 402, 403 (1982) ("A suit for copyright infringement is conditioned on obtaining (or being denied) a certificate of registration.").

right registration on May 5, 1986. That registration had not issued when, on July 3, 1986, MGB filed its original verified complaint asserting that its copyright was registered. On July 11, 1986, the court denied MGB's motion for a preliminary injunction and dismissed the entire case citing MGB's failure to satisfy the condition precedent of having registered its copyright before initiating the infringement action. After this dismissal, MGB filed an amended copyright registration application. At the request or suggestion of the Copyright Office, it changed forms (from TX—"textual" to VA—"visual arts") and the designation of the work (from "home plans" to "house drawings"). The certificate of registration was issued for this new submission on July 28, 1986. On the same day, MGB moved to amend its complaint. Although challenged by Ameron on jurisdictional grounds, the trial court allowed the amendment and the case was set for trial.

When the trial court initially dismissed MGB's complaint, it was without prejudice to "file a new complaint for copyright infringement" once the registration was obtained. (R. 20). In light of this order, the filing of a new lawsuit would ordinarily have been the proper way for MGB to proceed once it received the registration certificate. Because the trial court had dismissed the suit for lack of jurisdiction, it was, at most, technically without jurisdiction to entertain MGB's motion to amend its complaint. However, "[i]t is too late in the day and entirely contrary to the spirit of the Federal Rules of Civil Procedure for decisions on the merits to be avoided on the basis of such mere technicalities." *Foman*

*v. Davis*, 371 U.S. 178, 181, 83 S.Ct. 227, 230, 9 L.Ed.2d 222, 225 (1962).

F.R.Civ.P. 61 strongly supports our decision to proceed.

No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.

Congress has also commanded that on the hearing of any appeal, "... the court shall give judgment ... without regard to errors or defects which do not affect the substantial rights of the parties." 28 U.S.C. § 2111.

The amended complaint submitted by MGB contained all of the required allegations. On its face it asserted that the trial court had jurisdiction over the new infringement action. Except for the technical distinction between filing a new complaint and filing an amended complaint, the case would have been properly filed.[5] Ameron was not prejudiced by this error. We therefore hold that we have jurisdiction over this appeal and we will reach the merits.[6]

### A Blueprint of Copyright Law

The primary question raised by this appeal is whether MGB is an "owner" of the

---

**5.** There was some question as to whether Ameron was properly served notice of the amendment, however, any objections they might have raised were waived by their general appearance *in response to the amended complaint*. *See* F.R.Civ.P. 12(g), (h).

**6.** We reject as spurious Ameron's argument that because MGB filed a complaint asserting copyright registration prior to its attaining such registration, it was *guilty of unclean hands*. MGB acted within the bounds of an arguably accepted practice.

Further, the Eleventh Circuit has allowed injunctive relief to be sought prior to registration. *Pacific & Southern Co. v. Duncan*, 744 F.2d 1490, 1499 n. 17 (11th Cir.1984), *cert. denied*, 471 U.S. 1004, 105 S.Ct. 1867, 85 L.Ed.2d 161 (1985). This authority does not solve our jurisdictional problem, however, because the trial court held that all of MGB's claims for relief were premature and dismissed the case *in toto*. Although *Pacific & Southern* indicates that the trial court had the ability to retain jurisdiction over the equitable claims after dismissing the infringement claim had it desired to do so, we are faced with a situation where it did not.

copyright in the advertising flyer. Under the Copyright Act of 1976, ownership of a copyright is determined as follows:

(a) *Initial Ownership.*—Copyright in a work protected under this title vests initially in the author or authors of the work. The authors of a joint work are coowners of copyright in the work.

b) *Works Made for Hire.*—In the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author for purposes of this title, and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright.

17 U.S.C. § 201 (West 1977). Section 101 defines a work made for hire as:

(1) a work prepared by an employee within the scope of his or her employment; or

2) a work specially ordered or commissioned for use [a] as a contribution to a collected work, [b] as part of a motion picture or other audiovisual work, [c] as a translation, [d] as a supplementary work, [e] as a compilation, [f] as an instructional text, [g] as a test, [h] as answer material for a test, or [i] as an atlas, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire....

In its copyright application, MGB identified itself as a "work-for-hire" author of the advertising flyer depicting the "Islander II" floor plan. Ameron asserted, as a complete defense to the infringement claim against it, that MGB is not a valid copyright owner under this doctrine.[7]

■ First, we hold that Ameron does have the right to assert this defense. It is not unheard of, as MGB asserts, for the "work-for-hire" issue to arise "as a defensive tactic adopted by a third-party infringer to dispute the validity of the plaintiff's copyright." *Easter Seal Society for Crippled Children and Adults of Louisiana, Inc. v. Playboy Enterprises,* 815 F.2d 323, 333 (5th Cir.1987), *cert. denied,* 485 U.S. 981, 108 S.Ct. 1280, 99 L.Ed.2d 491 (1988).[8] As that court pointed out, and we adopt, this defense gives the putative infringer, rather than the creator of the work, the benefits of finding a work was not a "work-for-hire." *Id.*

■ Under the Copyright Act of 1909, the "work-for-hire" doctrine created a rebuttable presumption of authorship in the employer. *See Murray v. Gelderman,* 566 F.2d 1307, 1309 (5th Cir.1978) (citations omitted).[9] The crucial factor in applying this presumption was "whether the work was created at the employer's insistence and expense, or, in other words, whether the motivating factor in producing the work was the employer who induced its creation." *Id.* at 1310 (citations omitted). The trial court apparently relied on this formulation. We hold that *Murray* is no longer valid precedent because (i) it was overruled by the amendments to the Copyright Act in 1976[10] and (ii) its rationale was rejected by *Community for Creative Non-Violence v. Reid,* 490 U.S. ——, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989) [*CCNV*],[11]

---

**7.** The plaintiff in a section 501 action establishes a prima facie case of copyright infringement by proving by a preponderance of the evidence (1) that it *owns* a valid copyright in the work allegedly infringed, and (2) that the defendant copied that work.
*Donald Frederick Evans and Assoc. v. Continental Homes, Inc.,* 785 F.2d 897, 903 (11th Cir. 1986) (emphasis added), *citing Original Appalachian Artworks, Inc. v. Toy Loft, Inc.,* 684 F.2d 821, 824 (11th Cir.1982).

**8.** The *Easter Seal* court was describing the situation in *Aldon Accessories Ltd. v. Spiegel, Inc.,* 738 F.2d 548 (2d Cir.), *cert. denied,* 469 U.S. 982, 105 S.Ct. 387, 83 L.Ed.2d 321 (1984).

**9.** Superceded by the 1976 statute as stated in *Easter Seal, supra.*

**10.** This action is governed by the 1976 Act which became effective January 1, 1978.

**11.** Thus we are not concerned with the Eleventh Circuit *en banc* opinion which adopted Fifth Circuit law, *see Bonner v. City of Prichard, Alabama,* 661 F.2d 1206 (11th Cir.1981), or the effect of subsequent Fifth Circuit decisions on that precedent.

which defined the "work for hire" doctrine under the 1976 Act.

Prior to *CCNV*, three approaches for determining when a work was made for hire under the 1976 Act had developed.[12] One was the "literal" approach where agency rules were used to determine whether the "seller"[13] of the work was an employee or an independent contractor. Once that determination was made, § 101 was applied to determine whether the work was "for hire." This was the approach adopted by the Fifth Circuit in *Easter Seal, supra.* A second approach was dubbed "conservative." Under this theory, the old statutory presumption that the "buyer" was the author began the analysis. The nine categories of independent contractors in § 101(2) were treated specially: the buyer was only the author if there was a written agreement. The third approach was that adopted by the Second Circuit in *Aldon Accessories Ltd. v. Spiegel, Inc.*, 738 F.2d 548 (2d Cir.), *cert. denied*, 469 U.S. 982, 105 S.Ct. 387, 83 L.Ed.2d 321 (1984). An independent contractor could be deemed an employee under this theory if he was sufficiently controlled and supervised. This circumvented the writing requirement. Neither the briefs nor our research revealed that the Eleventh Circuit had adopted any one or more of these approaches.

All of this debate was recently ended when the Supreme Court in *CCNV* held that the "literal" approach to the "work-for-hire" doctrine was correct under the 1976 Act.[14]

To determine whether a work is for hire under the Act, a court first should ascertain, using principles of general common law of agency, whether the work was prepared by an employee or an independent contractor. After making this determination, the court can apply the appropriate subsection of § 101.

490 U.S. at ——, 109 S.Ct. at 2178, 104 L.Ed.2d at 831. According to the Supreme Court, under the general law of agency, we look to the hiring party's right to control the way in which the product—here the architectural plans and house drawings that made up the advertising flyer—is made in order to determine if the hired party is an employee or an independent contractor. Some of the factors relevant to this determination are:

the skill required, the source of the instrumentalities and tools, the location of the work; the duration of the relationship between the parties, whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment, the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits, and the tax treatment of the hired party.

490 U.S. at ——, 109 S.Ct. at 2178–79, 104 L.Ed.2d at 831–32 (citations omitted).[15]

---

**12.** For an in-depth analysis of the various approaches to the "work-for-hire" doctrine and their relative merits, *see* Note, *The "Work Made for Hire" Definition in the 1976 Copyright Act—A Simple Dichotomy: Easter Seal Society for Crippled Children and Adults of Louisiana, Inc. v. Playboy Enterprises*, 26 Hous.L.Rev. 361 (1989).

**13.** The "buyer" is the putative employer who engages the services of the employee or independent contractor, referred to as the "seller."

**14.** Thus it appears that *CCNV* approved the position adopted by the Fifth Circuit in the *Easter Seal* case while disapproving the *Aldon Accessories* approach.

**15.** According to the Restatement (2d) of Agency,
In determining whether one acting for another is a servant or an independent contractor,

the following matters of fact, among others, are considered:
  (a) the extent of control which, by the agreement, the master may exercise over the details of the work;
  (b) whether or not the one employed is engaged in a distinct occupation or business;
  (c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;
  (d) the skill required in the particular occupation;
  (e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;
  (f) the length of time for which the person is employed;
  (g) the method of payment, whether by the time or by the job;

The facts giving rise to the *CCNV* case were as follows. The organization, CCNV, hired a sculptor, Reid, to make a statue called "Third World America." CCNV conceived the idea. It decided there would be two adults and one child in it. It determined these people would be black; they would be portrayed as contemporary homeless people; the figures would be lifesized; they would be positioned over a steam grate in a pedestal (made by CCNV) rigged to send steam over them; and certain materials would be used. Dozens of CCNV members assisted Reid during the creative process and coordinated their work with his. CCNV members took Reid out to observe homeless families and pointed out to him common features which were incorporated into the sculpture. CCNV decided on the caption that would be included on the pedestal of the sculpture. In light of these facts, the Supreme Court found that although "CCNV members directed enough of Reid's work to ensure that he produced a sculpture that met their specifications.... the extent of control the hiring party exercises over the details of the product is not dispositive. Indeed, all the other circumstances weigh heavily against finding an employment relationship." 490 U.S. at ——, 109 S.Ct. at 2179, 104 L.Ed.2d at 832. Thus the Supreme Court held that Reid was not an employee of CCNV, but an independent contractor. CCNV could not show that the terms of § 101(2) were satisfied, thus it could not be a statutory author under the "work-for-hire" provision. *Id.* 490 U.S. at ——, 109 S.Ct. at 2179–80, 104 L.Ed.2d at 832–33.

Our case is much the same. Although Ballough exercised control and direction over the finished product that Unlimited Drafting Services produced, all the other circumstances militate against finding the drawings were done as a work for hire. Unlimited provided skilled drafting services. It provided its own office space, tools and supplies. Unlimited was retained for a comparatively short period of time—a few weeks. MGB did not have the ability to assign new projects to Unlimited during that time (other than by entering a new contract). Unlimited was free to determine the days and hours on which its employees worked. Unlimited had total discretion in hiring and firing its own employees without interference by MGB. Unlimited paid its own taxes and withholding for its employees. Drafting was not a part of the regular business of MGB which always used an outside drafting firm. In short, Unlimited was an independent contractor, not an employee.

Once this decision has been made, under the mandate of *CCNV* we look to the language of § 101(2) to determine if the advertising flyer was a work for hire. The language of the statute was not complied with in two regards: (i) architectural drafting does not fall within the nine enumerated categories of activities which may be done by independent contractors "for hire" and (ii) there is no evidence that MGB and Unlimited had a contract stating that the drawings would be considered a work for hire. We therefore conclude that MGB was not the author of the house drawings under the "work-for-hire" doctrine.

■ A question remains, however, as to whether MGB is a co-author of the plans because of the control and discretion it exercised over the content of the final product. Ballough testified that he reviewed the drawings in progress, made suggestions and corrections, and had final approval authority over the work of Unlimited.

The Copyright Act does not define joint authorship *per se*. It does state, however, that "[t]he authors of a *joint work* are coowners of copyright in the work." 17 U.S.C. § 201(a) (West 1977) (emphasis added). A "joint work" is defined as "a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent

(h) whether or not the work is a part of the regular business of the employer;

(i) whether or not the parties believe they are creating the relation of master and servant; and

(j) whether the principal is or is not in business.

Restatement (Second) of Agency § 220(2) (1958).

parts of a unitary whole." 17 U.S.C. § 101 (West 1977). The terms "inseparable" and "interdependent" may be explained as follows:

> [I]f author B's contribution when combined with author A's contribution results in recasting, transforming or adapting A's contribution, then the two contributions may be said to be inseparable. If the process is simply one of assembling into a collective whole A's and B's respective contributions, without thereby recasting A's contribution, then the two contributions may be said to be interdependent.

1 M. Nimmer and D. Nimmer, *Nimmer on Copyright* § 6.04 at 6–11 (1989). Co-owners are, of course, equally entitled to claim a copyright in the undivided whole of the protected work. *See* 1 *Nimmer* § 6.03 at 6–6.

The situation of coownership is not presented by the facts of this case. Ballough's contribution to the final drawings produced by Unlimited was a thumbnail sketch of the floor plan he desired for the "Islander II" and approval authority thereafter. "Such involvement by a client in the preparation of architectural plans is normally expected. . . . Such involvement does not, however, ordinarily render the client an 'author' of the architectural plans." *Aitken, Hazen, et al. v. Empire Construction Co.*, 542 F.Supp. 252, 259 (D.Neb. 1982). There is no evidence that it was the intent of either Ballough or Unlimited that this concept (the sketch) become part of the finished expression (the architectural plans and drawings). In fact, the sketch did not form an "inseparable or interdependent" part of the final house drawings.

It is clear that Ballough was not a "creator"[16] of the copyrighted work at issue here. His ideas, conveyed to the author of

the copyrighted work, Unlimited, were not copyrightable. 17 U.S.C. § 102(b).[17] Ballough's "failure to have 'created' or 'prepared' the work within the meaning of the statute bars his asserting a copyright interest even as a joint author of the plans." *Meltzer v. Zoller*, 520 F.Supp. 847, 857 (D.N.J.1981); *see aslo Aitken, Hazen*, 542 F.Supp. at 258–59.

We therefore hold that MGB did not have a valid copyright in the advertising brochure that was copied. Ameron's actions consequently were not an infringement. The trial court was in error in so holding.

## A House of Cards

■ No attorneys' fees or statutory damages were available to MGB under the Copyright Act because the advertising materials were not registered with the Copyright Office at the time the alleged infringement occurred. 17 U.S.C. § 412 (West 1977). Nonetheless, the trial court awarded both attorneys' fees and punitive damages to MGB under Florida law. The precise source of these awards is unclear in the district court's order. They arose under some combination of the Florida common law of unfair competition and the Florida Deceptive and Unfair Trade Practices Act, Fla.Stat.Annot. § 501.201, *et seq.*[18] For the reasons stated below, we reverse both awards.

The cause of action for common law unfair competition must fail. In order "to prevail on its unfair competition claim under Florida common law, . . . [plaintiff] must prove elements other than those mandated in an action under the Copyright Act. Florida law requires that [plaintiff] establish deceptive or fraudulent conduct of a competitor and likelihood of consumer con-

---

**16.** A work is "created" when "it is fixed in a copy . . . for the first time." 17 U.S.C. § 101 (West 1977).

**17.** "In no case does copyright protection for an original work of authorship extend to any idea, . . . concept, . . . regardless of the form in which it is described, explained, illustrated, or embodied in such work." 17 U.S.C. § 102(b) (West 1977).

**18.** The parties seem to agree that the common law unfair competition claim served as the basis for the punitive damage award and the attorneys' fee award arose out of the trial court's application of the Florida DTPA. Such distinction is irrelevant to our holding.

fusion." *Donald Frederick Evans and Assoc. v. Continental Homes, Inc.*, 785 F.2d 897, 914 (11th Cir.1986).[19] There is no evidence and no finding by the trial court that Ameron attempted to pass off MGB's plan as its own. The Sterns knew full well that the basic floor plan of their home was that of MGB's "Islander II." They insisted upon that floor plan even after Brognano told them that MGB was a fine builder and that Ameron could not build them exactly the same home. There is no evidence whatsoever that the Sterns were confused as to the source of the plans for their home.[20]

What the trial court did find was that MGB's right to relief for unfair competition arose,

> from the intentional plan and actions thereunder to deprive plaintiff of a valuable business opportunity by offering to make either an identical or substantially similar home for Mr. and Mrs. Stern who wanted the exact layout of plaintiff's Islander II model, where defendants knew full well that they would copy from plaintiff's brochure to make that home.

In other words, the trial court found that Ameron competed unfairly because it planned to copy MGB's work. It held that this was not pre-empted by the Copyright Act, but arose collaterally. We disagree.

The Copyright Act provides that "all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright ... are governed exclusively by this title." 17 U.S.C. § 301(a) (West 1977). A claim for unfair competition based upon allegations of copying, and in the absence of proof of any element of unfair competition other than copying, is clearly pre-empted by the Act.

■ Likewise we hold that the trial court erred in applying the Florida Deceptive

Trade Practices Act, Fla.Stat.Annot. § 501.201, *et seq.* (1973). That Act does not apply to suits between competitors. There is no question that MGB and Ameron—home builders in the same small Florida town with model homes on the same street—were competitors. *See* §§ 501.202 and 501.203(1).[21] *Darrell Swanson Consolidated Services v. Davis*, 433 So.2d 651, 652 (Fla.App.1983), holds that a cause of action under the Florida DTPA "is legally insufficient in the absence of a showing that the plaintiff has not previously been engaged in the business involved." Obviously MGB was an active participant in the homebuilding business here involved long before suit was brought. *See also Bryant Heating & Air Conditioning Corp., Inc. v. Carrier Corp.*, 597 F.Supp. 1045, 1053 (S.D.Fla.1984).

Because neither the common law unfair competition claim nor the Florida DTPA claim can stand, it was error for the trial court to award punitive damages and attorneys' fees. Those awards are hereby reversed.

### *The Best–Laid Plans ...*

All of the substantive determinations of the trial court are hereby reversed. MGB loses on its copyright infringement claim because it does not own a valid copyright. Thus the actual damage award of $1,206.99 is reversed. MGB also failed to state claims for common law unfair competition and violation of the Florida DTPA. Thus the awards of attorneys' fees and punitive damages are reversed.

REVERSED AND RENDERED.

---

**19.** *See also Stagg Shop of Miami, Inc. v. Moss*, 120 So.2d 39 (Fla.App.1960); *Professional Golfers Ass'n of America v. Bankers Life & Casualty Co.*, 514 F.2d 665, 671 (5th Cir.1975) (Under the Florida case law, "likelihood of consumer confusion and passing off one's goods or services as those of another constitute the gravamen of the action."), both *cited in Evans, supra.*

**20.** Under *Evans*, 785 F.2d at 915, the test is "whether the defendants were misrepresenting their homes as those of [plaintiff] or whether there was a likelihood of consumer confusion as to the source of the homes."

**21.** The Florida DTPA applies to consumer transactions, defined in part as transactions in which the consumer "has not been previously engaged."