**ARTHUR RUTENBERG HOMES, INC., a Florida corporation, Plaintiff,**

v.

**DREW HOMES, INC., a Florida corporation and Andrew J. Vecchio, Jr., an individual, Defendants.**

No. 92–548–Civ–T–21(A).

United States District Court, M.D. Florida, Tampa Division.

July 26, 1993.

---

Frank R. Jakes, Johnson, Blakely, Pope, Bokor, Ruppel & Burns, P.A., Tampa, FL, for Arthur Rutenberg Homes, Inc.

David L. Partlow, Gibbons & Partlow, P.A., Tampa, FL, for Drew Homes, Inc. and Andrew J. Vecchio, Jr.

## MEMORANDUM OPINION

CHARLES R. WILSON, United States Magistrate Judge.

This action was tried before the Court upon a Complaint alleging infringement of copyrighted architectural drawings entitled the "Verandah II", allegedly owned by Arthur Rutenberg Corporation ("ARH") and licensed to David Allen Properties, Inc. ("DAP"). ARH claims that defendant, Drew Homes, Inc. and its President and sole officer and shareholder, Andrew J. Vecchio, Jr., infringed upon its copyrighted Verandah II architectural drawings when preparing drawings for a house constructed by defendant in the Bayport Village subdivision in Hillsborough County, Florida. Having considered the evidence and the record, the Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

In 1987, the Verandah II was designed by Stan Heise of the Heise Group, Inc. which was an architectural firm specializing in customer design work. Heise developed a portfolio of architectural plans for Chrysalis Homes Associates ("Chrysalis") who built single family homes in Pinellas and Hillsborough County, Florida. Edward Bellamy was then President of Chrysalis. Bellamy is now ARH's Vice–President of Marketing and testified at the trial. According to Bellamy, Heise and Chrysalis verbally agreed that the copyright and any resulting architectural drawings developed by Heise for Chrysalis would be owned by Chrysalis. In accordance with this arrangement, Heise prepared the Verandah II architectural drawing in addition to various other drawings.

In early 1988, Chrysalis filed a Certificate of Copyright Registration for the Verandah II with the United States Copyright Office, identifying Chrysalis as both the author and the copyright claimant. A copy of the blueprint for the Verandah II lists the copyright registration, which is customary in the industry.

Verandah II models appeared in locations in Pinellas and Hillsborough County, including in the Tampa Palms subdivision and was featured in the "Street of Dreams" competition in 1988 visited by prospective home purchasers.

In early 1990, Chrysalis ceased doing business. On February 19, 1990, Chrysalis sold the Verandah II copyrighted plans to ARH and assigned its copyrights to ARH. A written "Certificate of Release" from Heise was also entered which clarified that Heise had assigned all of its rights, interests and own-

ership in the copyrights for the Verandah II plan to Chrysalis. The written assignments were recorded in the United States Copyright Office.

Before the trial ARH applied for and received from the Copyright Office a Certificate of Supplementary Copyright Registration correcting the Verandah II copyright registration to reflect Heise as the author and Chrysalis as owner by assignment.

Andrew Vecchio, Jr., is the President, and sole officer and director of Drew Homes, Inc. which was in the business of constructing residential homes in Hillsborough County. In April of 1991, Drew Homes acquired an undeveloped lot in the Bayport Village subdivision in Hillsborough County for the purpose of constructing a home. In April of 1991, Vecchio engaged the services of Edgar Ellerbe, a draftsman, to draft plans for the purpose of constructing the home on this lot. It was Vecchio's intention to build a home for himself, although he sold the home for a profit prior to its construction. Vecchio had engaged in this practice significantly in the past.

Vecchio presented Ellerbe with a brochure for a home called "The Cashmere" which had previously been built by HomeCraft which was a company believed by Vecchio to be out of business at the time. The Heise Group, Inc. had developed the architectural plans for the Cashmere. Vecchio presented Ellerbe with the HomeCraft brochure and Ellerbe then proceeded to prepare preliminary drawings from those plans.

At the trial, Vecchio admitted that at the time that he presented the Cashmere plan to Ellerbe, he had in his possession, in a box at his residence where he keeps clippings and home brochures, the Chrysalis Verandah II plan, but he was not aware of its existence at the time. He testified that he had never seen a Verandah II model although he was at the Street of Dreams competition when the model was presented for customer view, in 1988. Although he didn't go inside the model home, he did pick up a brochure which he kept.

The HomeCraft Cashmere plan does not bear a copyright notice, and was not, in fact, copyrighted. Vecchio did not seek permission from HomeCraft to use its Cashmere floor plan, and did not need to.

Ellerbe testified at the trial that he prepared a preliminary floor plan solely from a marked-up HomeCraft floor plan presented to him by Vecchio. Various modifications were made including:

A. A different design for the pool.

B. The sitting room at the end of the master bedroom and the master bedroom were moved to the front of the house.

C. A raised foyer was implemented with steps up to the foyer area.

D. The office was placed next to the foyer.

E. Columns were taken out.

F. The ceilings were made higher.

G. The seat at the breakfast nook was eliminated.

H. The large walk-in closet was changed to a small broom closet.

I. There was an offset on the garage.

J. There was an outside entry for the pool bath.

K. Closets in the gameroom were eliminated where a fourth bedroom would be.

L. The house was changed so that there would be 3,200–3,300 square feet of living area.

Ellerbe completed the drawing and incorporated the changes. Additional changes were later made including reverting the gameroom back to a bedroom with a closet and other minor changes in the square footage.

Before completion of the final drawing, Vecchio testified that he came across the Chrysalis Verandah II brochure, realized that there was a copyright claimed in the drawing and also learned that it was substantially similar to the HomeCraft Cashmere. He testified that he found certain items in the Verandah II that he wished to incorporate into the Cashmere plan including a new arrangement for the family room fireplace, the kitchen island, and the divider between the living and dining areas. The result of these changes was that the architectural plan ultimately finalized by Ellerbe was substantially similar to the Verandah II plan.

Vecchio had heard that Chrysalis had been out of business for two years, but he was unaware that the rights to those plans had been transferred to ARH. Ellerbe testified that had he known that Chrysalis had sold the Verandah II plan to Rutenberg, he would not have used the Verandah II house sheet, and that it was not his practice to draft from copyrighted plans.

The similarity between the Drew Homes final architectural and the Verandah II plan is strikingly similar. The Drew Homes plan is far more similar to the Verandah II floor plan than the HomeCraft Cashmere floor plan.

Before construction of Vecchio's home was complete, he sold the home to a customer for $330,000.00, realizing a profit of $12,502.00. Vecchio testified that his business overhead for 1991 was $15,000.00. His overhead expense for the Bayport Village was $33,000.00 based upon his building of five homes in 1991.

When Vecchio learned that ARH was considering legal action for violation of its copyright, he had a telephone conversation with Frank Henderson who is the President of an ARH franchisee and a social acquaintance. At the trial, Henderson related the following discussion:

> "I called Andrew to discuss the possibility of using an Arthur Rutenberg plan, and I asked him if he had used the plan. He said that he had used the plan, that basically he felt that—well, he knew that Chrysalis Homes had gone out of business, and he was not aware of anyone having the rights to the plan so he didn't see anything wrong in using the plan." (T. 202)

Henderson's testimony was corroborated by Bellamy who also had a conversation with Vecchio when Vecchio learned that legal action was contemplated:

> "He told me that he had seen the Verandah plan; that he saw it in the Tampa Palms Street of Dreams; that he believed that since Chrysalis was no longer in business, that there wouldn't have been a copyright problem; that he and his wife intended to reside in the house; that prior to— and that his wife had really liked the Ver-

andah; that prior to his—they were moving into the house, it had been sold; that he felt that there wasn't a legal problem because he, in fact, was just building it for he and his wife to live in." (T. 196)

Vecchio failed to mention that he had used the HomeCraft Cashmere plan during this conversation nor did he mention it during his conversation with Henderson. Vecchio was very equivocal and unsure in responding to the validity of these conversations at the trial.

DAP maintained a model center at Bayport Village subdivision as a franchisee of ARH. Under its franchise agreement with ARH, DAP was the only builder licensed and authorized to use the Rutenberg copyrighted plans to build homes in that subdivision. The average profit after construction expenses and franchise fees realized by Rutenberg franchisees when constructing homes based on the Verandah plan is 13.6 percent of the sales price.[1] Additionally, Rutenberg receives a franchise fee of 3.5 percent of the sales price.

Thomas Kruempelstaedter, an architect, reviewed the HomeCraft Cashmere plan, the Verandah II plan and the Drew Homes plan which is the subject of this action. In his opinion, it is "highly unlikely" that the Drew Homes plan could have been derived from the HomeCraft plan rather than the Verandah II plan. The Verandah II and Drew Homes plans are significantly similar and there are few deviations.

### CONCLUSIONS OF LAW

■ Architectural plans are subject to Federal copyright protection. *Arthur Rutenberg Corporation v. Dawney*, 647 F.Supp. 1214, 1215 (M.D.Fla.1986). An infringement occurs if copyrighted architectural drawings of the originator of such plans "are imitated or transcribed in whole or in part". *Id.* (relying upon *Shipley*, Copyright Protection for Architectural Works, 37 S.C.L.Rev. 393, 396–399 (1986).

■ A *prima facie* case of copyright infringement occurs if a preponderance of the evidence establishes the following: (1) ownership of a valid copyright to the work in

---

1. However, DAP is not a named plaintiff in this case.

question, and (2) copying by the defendant. *Donald Frederick Evans & Associates, Inc. v. Continental Homes, Inc.*, 785 F.2d 897, 903 (11th Cir.1986).

It is rarely possible for an author to prove copying directly. Therefore, the Courts have developed a two-part test to prove copying indirectly: "(1) the defendant had access to the work and (2) the defendant's work is substantially similar to the plaintiff's work." *Original Appalachian Artworks, Inc. v. Toyloft, Inc.*, 684 F.2d 821, 829 (11th Cir.1982); *Novelty Textile Mills, Inc. v. Joan Fabrics Corporation*, 558 F.2d 1090 (2d Cir.1977).

A *prima facie* case may be rebutted by the accused infringers who must negative the probability of copying by evidence of independent creation. *See Overman v. Loesser*, 205 F.2d 521, 523 (9th Cir.1953). 3 M. Nimmer & D. Nimmer, *Nimmer on Copyright*, § 12.11[D] (1992).

Drew Homes and Vecchio contend that the copyright registration upon which this action was based is not valid and enforceable by ARH pursuant to the "work-for-hire" doctrine because the initial copyright registration in 1988 erroneously claimed Chrysalis as the author while in fact the Heise Group, Inc. was the proper author and owner of the unregistered copyright. Plaintiff's counter that the law regarding "work-for-hire" was in a state of flux when the original copyright registration was filed, that the error was corrected with a supplementary copyright registration along with written assignments of the Verandah II copyright from Heise to Chrysalis and from Chrysalis to Rutenberg in accordance with 17 U.S.C. § 204(a).[2] Plaintiff urges that the Court consider numerous authorities which support the conclusion that the note or memorandum of the transfer need not be made at the time the license is initiated as long as there is a later execution of a writing which confirms the transfer agreement. *See Eden Toys, Inc. v. Florelee Undergarment Co.*, 697 F.2d 27, 36 (2d Cir.1982); *accord Kenbrooke Fabrics v. SoHo Fashions, Inc.*, 690 F.Supp. 298, 301 n. 2 (S.D.N.Y.1988); *See also Valente–Kritzer Video v. Pinckney*, 881 F.2d 772, 775 (9th Cir.1989) and *Dan–Dee Imports, Inc. v. Well–Made Toys Mfg. Corp.*, 524 F.Supp. 615 (E.D.N.Y.1981).

The Copyright Act of 1976 provides that copyright ownership "vests initially in the author or authors of the work." *Community for Creative Non–Violence v. Reid*, 490 U.S. 730, 737, 109 S.Ct. 2166, 2171, 104 L.Ed.2d 811 (1988) (quoting 17 U.S.C. § 201(a)). "As a general rule, the author is the party who actually creates the work, that is the person who translates an idea into a fixed, tangible expression entitled to copyright protection. § 102. The Act carves out an important exception, however, for 'works made for hire'. If the work is for hire, 'the employer or other person for whom the work was prepared is considered the author' and owns the copyright, unless there is a written agreement to the contrary. Section 201(b)." *Id.* (footnotes omitted).

Under the Copyright Act of 1976, ownership of a copyright is determined as follows:

(a) Initial Ownership.—Copyright in a work protected under this title vests initially in the author or authors of the work. The authors of a joint work are co-owners of copyright in the work.

(b) Works Made For Hire.—In the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author for purposes of this title, and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright.

17 U.S.C. § 201 (1977). Works made for hire include, "a work prepared by an employee within the scope of his or her employment" in addition to nine specific categories *not related to architectural drawings. Id.*

In its copyright application, Chrysalis identified itself as a "work-for-hire" author of the Verandah II floor plan. Defendants assert, as a complete defense to the infringement claim against it, that ARH is not a valid copyright owner under this doctrine.

Although supplementary registration is permitted pursuant to 17 U.S.C. § 408(d) to

---

**2.** "A transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owners duly authorized agent." 17 U.S.C. § 204(a).

correct errors in an original application, ARH's attempt to correct the error in the original application by submitting its supplementary registration application correcting the statement of the original author from Chrysalis to the Heise Group, Inc. is ineffective due to the existence of a provision of the Code of Federal Regulation which states in pertinent part:

> Supplementary registration is not appropriate ... to reflect the ownership ... or transfer of rights in a work whether at the time basic registration was made or thereafter ...

37 C.F.R. Chapter II § 201.5(b)(2)(iii). Therefore, the initial registration was not properly claimed by Chrysalis since it was made at a time when copyright was owned by the Heise Group, Inc. prior to transfer to Chrysalis. Although the Code allows supplementary registration to reflect the relation back of a subsequent transfer for some purposes, the specific regulation cited above disallows relation back for the purpose of changing the claim of legal ownership. Only the Heise Group, Inc. could have made an application at the time that registration was applied for.

The second element of establishing a *prima facie* case of copyright infringement is not seriously in dispute since Vecchio clearly had access to the Verandah II architectural plans and since the Drew Home Plan is substantially similar to the Verandah II—in fact, far more similar to the Verandah II than the HomeCraft Cashmere plan. However unpersuasive Drew Homes' and Vecchio's evidence of independent creation may be, defendants must prevail in this action since ARH is not a valid copyright owner under the "work-made-for-hire" doctrine. The Court acknowledges that Heise did execute a written assignment of the Verandah II copyright to Chrysalis after the issuance of the Verandah II Certificate of Registration and that written evidence of transfer may legally be made after the time that the license is initiated. However, the two subsequent assignments of the registration for this copyright were ineffective since no registration of copyright was ever applied for by the party who was the legal owner at the time of the application. In the Eleventh Circuit, if an ownership error exists due to improper application of the "work-made-for-hire" doctrine, as opposed to any other kind of error, a plaintiff may not enforce a copyright in an infringement action. *M.G.B. Homes, Inc. v. Ameron Homes, Inc.,* 903 F.2d 1486 (11th Cir.1990).

### CONCLUSION

Arthur Rutenberg Homes, Inc. loses on its copyright infringement claim solely because it did not own a valid copyright at the time of the suggested infringement. Thus, the court directs the Clerk to enter judgment for the defendants with each party to bear its own costs and attorney's fees pursuant to 17 U.S.C. § 505.

DONE AND ORDERED.